**TRIBORO SCOW CORPORATION, as owner of THE Scow TRIBORO NO. 12, Libelant,**

v.

**M. F. HICKEY CO., Inc., and Douglas James, Respondents, and Gallagher Brothers Sand & Gravel Corporation, and THE tug JOHN MURRAY, Respondent-Impleaded.**

**No. 20504.**

United States District Court
E. D. New York.
Oct. 16, 1959.

Purdy, Lamb & Catoggio, New York City, for libelant. By Vincent A. Catoggio, New York City, Advocate, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, for M. F. Hickey Co. Inc., respondent petitioner. By Gerald J. McKernan, New York City, Advocate, of counsel.

Giallorenzi & Cichanowicz, New York City, for respondent Douglas James. By Martin J. McHugh, Advocate, of counsel.

Foley & Martin, New York City, for respondent-impleaded Gallagher Brothers Sand & Gravel Corp. and Tug "John Murray", respondent-impleaded. By Edward J. Ryan, New York City, Advocate, of counsel.

RAYFIEL, District Judge.

The libelant brought this action to recover for damages sustained by its scow, Triboro No. 12, which capsized on January 25, 1956 by reason of the alleged negligence of the respondents, M. F. Hickey Co. Inc., hereinafter called Hickey, and Douglas James. Hickey denied its negligence and impleaded Gallagher Brothers Sand and Gravel Corporation, hereinafter called Gallagher, alleging in its impleading petition that it (Hickey) was not negligent, but that the Triboro No. 12 sustained the damage by reason of the negligence of the tug John Murray, owned and operated by Gallagher.

During the course of the trial the action against the respondent Douglas James was discontinued by the libelant.

The facts are as follows: The libelant's vessel, Triboro No. 12, was a wooden deck scow 116.6 feet long, 35.7 feet wide, and had a registered depth of 9 feet and one foot freeboard. At either end of her deck she had a bulkhead, which was 8 feet high at her bow and 10 feet high at her stern. Her captain testified that on January 25, 1956 she was sound and did not leak. She had been chartered by Gallagher, and her cargo of sand and gravel, loaded to a maximum height of 8 feet on her deck, was consigned to Hickey at its plant at East 69th Street and Avenue X, in Mill Basin, Brooklyn, New York.

At about 1:00 A.M. on January 25, 1956 she was towed by the tug John Murray to the vicinity of the Hickey plant, which had a bulkhead facing Mill Basin, some 250 feet long, and running north and south. Prior to the arrival of the Triboro No. 12 three scows were made fast, all lengthwise, to the Hickey bulkhead. One, the Hunts Point, was made fast to the bulkhead; outside of and made fast to the Hunts Point was the McCormack 84, and outside of and made fast to the latter was the Amherst. The latter was light, and was to be removed by the tug which was to bring the Triboro No. 12 in. The John Murray brought the latter in stern first on her (the tug's) port side. The captain of the No. 12 passed a line to the Amherst's captain who placed it on the McCormack 84. This line ran from the No. 12's starboard stern corner to the starboard bow corner of the McCormack 84 and had about twenty feet of slack. The tug then removed the Amherst and maneuvered the No. 12 into the position which the Amherst had occupied alongside the McCormack 84. She thus became the third scow out from the Hickey bulkhead. The temperature at that time was 22 degrees and the wind was from the northwest at 20 miles per hour.

The captain of the No. 12 then tried to throw another line onto the bitt on the starboard stern corner of the McCormack 84 but due to the darkness and the stiffness of the line, caused by the ice thereon, he failed. He tried again, and again he failed. Having been unable to reach the bitt on the McCormack 84, he crossed the bow of his scow in order to call to the tug for assistance. However, the tug had already taken the Amherst in tow and had started to leave. The captain of the No. 12 yelled to those on board the tug, but because of the strong wind and the distance between them it is unlikely that anyone on board heard him, and she proceeded on her way. The No. 12, with only one line holding her to the McCormack 84 drifted away from her because of the wind and the current, and she pivoted around so that her stern was behind the McCormack 84, but off at an angle from her bow. The captain of the No. 12 then pulled himself in toward the McCormack 84 manually on the one line he had out, using his capstan until he got his stern close enough to the bow of the McCormack 84 to permit him to board her. When he did he put on two additional lines. He described the three lines he then had out as a hawser on his port side, a dock line and a running line on the starboard side, all three of which were made fast to the bow bitts of the McCormack 84 from the stern bitts of his scow.

This operation was concluded at 3:00 A.M. Between 1:30 and 3:00 A.M., on that day, while he was engaged in said operation, a tug put another barge, the Steers 71, into the position which had originally been occupied by the Amherst, and tied her alongside of the McCormack 84. The four scows were in the position shown on Hickey Exhibit 3. The Hunts Point was alongside the Hickey bulkhead, the McCormack 84 was outside of and made fast to her, the Steers 71 was outside of and made fast to the McCormack 84, and the No. 12 was behind the McCormack 84, with her stern close to the bow of the latter. About 10 feet of the total length of the No. 12 lay in the waters off the Hickey bulkhead while the remainder thereof, some 106 feet, lay

in the waters off the property adjoining on the south.

The captain of the No. 12 went to sleep at about 3:00 A.M. and he awoke at about 6:30 A.M. Between 6:30 and 7:00 A.M. one Nicholas Zappoli, an employee of Gallagher, came aboard the No. 12 with Richard Torro, an employee of Hickey, for the purpose of measuring the cargo. After they boarded her the captain of the No. 12 left the scow to collect his pay. Zappoli and Torro completed the measurement of the cargo between 7:00 and 7:30 A.M. after which Zappoli went to the Hickey office where James G. Chambers, Hickey's dispatcher, who was in charge of the yard, signed a receipt for the cargo.

During this period the scow appeared to be in no difficulty, and was not leaking. Sometime between 8:00 and 8:30 A.M. the No. 12 commenced filling with water, and listing. Hickey's employees then attempted to move her in a northerly direction in order to bring her closer to the Hickey property so that her cargo could be discharged, but they were unsuccessful. Chambers attempted to get a tug to move her, but none was available, and at 9:30 A.M. she capsized.

Photographs taken after the occurrence revealed a hole in her bottom planking, which was caused by her coming to rest on a submerged object when the tide fell. The charts received in evidence showed underwater obstructions, described in the testimony as a wreck, at the place where the No. 12 was moored, at a point where the depth ranged from 4.9 feet to 7.2 feet at mean low water. Libelant's Exhibit 3, a chart which showed the height of the recorded tide on January 25, 1956, reveals that the tide had started to ebb at 5:45 A.M., that it was 5 feet above mean low water at 7:00 A.M., 3.9 to 4 feet at 8:00 A.M. and about 1.6 feet above mean low water at 9:30 A.M. when the No. 12 capsized.

The libelant contends that Hickey was negligent in permitting the No. 12 to remain in what is characterized as a foul berth after it had accepted the cargo. It points out that Geddes and Gilmartin, Hickey employees, testified that they saw the position of the No. 12 at about 7:00 A.M. and knew that she was in a bad berth by reason of the shallowness of the water there, but that nothing was done about it until about 8:30 A.M. when she had already begun to fill with water and list.

Hickey denies that it was negligent. It contends that both the libelant's scow captain and the crew of Gallagher's tug were negligent in failing to deliver the No. 12 properly. It points out that only 10 feet of the No. 12's length were in the waters off the Hickey bulkhead, and that about 110 feet were in the waters off the property to the south. It argues further that Gallagher's tug should not have left with the Amherst until the No. 12 had been tied up alongside of the McCormack 84, where there was plenty of depth to accommodate her at mean low water, instead of leaving her fastened by only one line; that the captain of the No. 12 should have signalled to the tug with his flashlight, when he saw that it was leaving him in a precarious position, and, also, that after tying up his scow he should have notified the libelant, Gallagher or Hickey that he had not been properly delivered. Further, Hickey contends that the captain of the No. 12 was negligent in leaving her without taking soundings which would have revealed that the water was too shallow for the No. 12 at the place where she lay.

I disagree with Hickey's contentions. Hickey's employees knew at 7:00 A.M. that the No. 12 was in an unsafe place and that its position would become even more precarious with an ebbing tide. Yet, the receipt for the cargo on the No. 12 (Libelant's Exhibit 4) which Chambers signed at 7:00 A.M. on January 25, 1956 contained no statement to indicate that the scow was not in a proper place or that the cargo was delivered in other than good condition. Chambers impressed me as an alert and intelligent man. I am quite sure that if either the cargo or the position and con-

dition of the No. 12 were other than satisfactory he would have been advised of that fact by the other Hickey employees, particularly the person who assisted in the measuring operation, and would have noted it on the receipt or would have refused to sign it. But, as aforestated, the receipt was unconditional. Having received the cargo Hickey owed the libelant's scow the duty of reasonable care, particularly since, as Geddes and Gilmartin both testified, they knew she was in a bad berth, and Hickey could have moved her between 7:00 A.M. and 8:00 A.M. when, unquestionably, she was still afloat, and not in difficulty.

A similar question was involved in C. F. Harms Co. v. Erie R. Co., 2 Cir., 167 F.2d 562, at page 563, in which Judge Learned Hand said, "We have several times decided that the relation of bailor and bailee, stricti juris, is not necessary in order to impose upon a consignee, or other person with whom a barge may be left, the duty of reasonable care to protect her until the owner or the charterer takes her back into possession."

In my opinion, Hickey failed to use reasonable care in permitting the No. 12 to remain in the position behind the McCormack 84. It had adequate equipment at its plant to move scows back and forth along its bulkhead and it should have moved her between 7:00 and 8:00 A.M. instead of permitting her to remain in a place which its own employees knew was dangerous, a fact which was unknown to the captain of the No. 12.

As to Hickey's argument that the No. 12's captain should not have left her, there was no proof of any requirement that he should have remained aboard. See Jacobus v. The Triboro No. 22, 2 Cir., 267 F.2d 547.

I have considered the other arguments advanced by Hickey against both the libelant and Gallagher, and find them without merit.

Accordingly, libelant is entitled to a decree against Hickey, and Hickey's impleading petition against Gallagher is dismissed.

Submit findings of fact, conclusions of law and decree in conformity herewith.