**ROAH HOOK BRICK CO. v. ERIE R. CO. et al.**

**UNITED STATES v. THE ROAH HOOK et al.**

**Petition of ROAH HOOK BRICK CO.**

**THE ROAH HOOK.**

Nos. 16958, 17865, 18112.

District Court, E. D. New York.
Jan. 29, 1948.

See also, D.C. 64, F.Supp. 288.

Mahar & Mason, of New York City (Frank Mason and Walter Lawlor, both of New York City, of counsel), for libellant Roah Hook.

Hagen & Eidenbach, of New York City (Charles Hagen and Nelson Johnson, both of New York City, of counsel), for Erie R. Co.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for Agwilines.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (William Postner, of New York City, of counsel), for the United States.

George A. Garvey, of New York City, for Jarka Corporation.

Foley & Martin, of New York City (Christopher Heckman, of New York City,

842

and Edward J. Ryan, of Rochester, N. Y., of counsel), for Carroll Towing Co.

James N. Senecal, of New York City, for Lee & Simmons.

INCH, District Judge.

These are two suits and a proceeding, duly consolidated, for the purpose of the trial. The evidence presents no difficulty so far as a consolidation for trial is concerned, but some confusion and multiplicity of defense is presented which, in turn, appears in the various main and reply briefs. This has caused caution on the part of the court, in order to fairly consider these different arguments and arrive, on the facts, at what it thinks is a proper decision in each suit.

In the first suit, Roah Hook Brick Company, as owner of the scow Roah Hook, filed a charter libel against the Erie Railroad Company, claiming damages during the charter period. Erie Railroad Company filed an answer to this libel and an amended petition under the 56th Rule in Admiralty, 28 U.S.C.A. following section 723, impleading Agwilines, Inc., R. A. Nichol & Co., Inc., United States of America, The Jarka Corporation and Carroll Towing Company, Inc. Subsequently, Carroll Towing Company, Inc., impleaded Simmons, Lee Corporation, as owner, and Lee & Simmons, Inc., as charterer of the tug Maren Lee.

United States of America answered the petition and, in turn, filed a petition under the 56th Rule in Admiralty, 28 U.S.C.A. following section 723, against Agwilines, Inc., The Jarka Corporation, Carroll Towing Company, Inc., Lee & Simmons, Inc., and Simmons, Lee Corporation, in which petition affirmative defenses, based on contract, were pleaded by United States of America.

In the second suit, United States of America filed its libel in a cause of contract and cargo damage and loss in rem against the scow Roah Hook, and in personam against Erie Railroad Company, Agwilines, Inc., The Jarka Corporation, Carroll Towing Company, Inc. Lee & Simmons, Inc., and Simmons, Lee Corporation.

In the third proceeding, Roah Hook Brick Co., claims exoneration from or limitation of liability as owner of the scow Roah Hook.

In the cargo case, R. A. Nichol & Co., Inc., has not been impleaded, but it has been stipulated that any negligence of R. A. Nichol & Co., Inc., is to be deemed that of the United States of America.

When all the testimony, including the exhibits, has been carefully considered, together with the various arguments of the parties in their briefs, we start with a simple situation which is not disputed. Substantially, this is as follows:

At the times in question, to wit, November 1943, a period of war activity. the United States owned the steamship Will Rogers, which on November 10, 1943, was tied up to the south side of Pier 36, North River. Merchants and Miners Transportation Company of Baltimore, was the general agent of the United States for this vessel, and the latter's New York agent was R. A. Nichol & Company, Inc. United States acted in these arrangements through the War Shipping Administration. At or about this time, the Government had purchased a large supply of automobile parts which it desired to be carried by the said steamship Will Rogers to Russia.

Accordingly, the Erie Railroad was engaged to furnish a scow to carry this cargo from the Erie Terminal at Weehawken to Pier 36, North River, so that it, at the desired time, could be loaded upon the said steamship.

Erie Railroad had under charter this scow Roah Hook from libellant, Roah Hook Brick Company. This boat was in sound seaworthy condition at the time it took on and carried the cargo, and subsequently was returned to said libellant in a damaged condition. This fact caused the first suit. In this suit the said Erie Railroad, as charterer, impleaded the various other parties in order to show that no blame could be placed upon it and that if anyone was at fault it was one or more of the latter parties so impleaded.

This scow, with its cargo, had arrived on November 10, 1943, at Pier 36, North River. Sometime after midnight of No-

vember 11th, the scow broke away from the pier where it had been moored by the Erie tug outside of a number of other boats, and was damaged, losing overboard a substantial part of its cargo. This gave rise to the suit by the United States, owner of the cargo. Again we have various parties impleaded, which are blamed for this loss.

■ With the above statement, it seems to me, that out of this controversy in the first suit we have, in effect, two simple issues. First, was the charterer, Erie Railroad liable for the damage to the scow Roah Hook because of its negligence and, Secondly, was some other party also liable in the subsequent drifting away of the scow, on the ground of negligence, after its cargo had been delivered by the Erie at Pier 36, North River. Edward G. Murray Lighterage & Transportation Co. v. Pennsylvania R. R., 2 Cir., 130 F.2d 199.

■ At this point, I am satisfied that there is no evidence, substantial enough on which to base a finding of negligence, on the part of the various shifting tugs which were employed at the terminal during the days of November 10th and 11th, 1943, and were busily engaged in bustling activity at Pier 36, North River, after the Erie tug Elmira, assisted by the Erie tug Rochester, had deposited the scow Roah Hook at Pier 36, North River. Nor is there any ground for finding liability on the part of The Jarka Corporation, which was the stevedore ready to work when the proper time arose for the actual loading of the cargo from this particular scow on to the steamship Will Rogers, which time never arose. These impleading petitions must be dismissed with costs. Nor is it necessary to dwell upon the petition to limit liability.

■ The first issue therefore is, was Erie, the charterer negligent? Secondly, was there also negligence on the part of some other party?

The Erie agreed to bring the scow to Pier 36, North River. The Erie tug Elmira accordingly towed this scow to that place. When it got there, the captain of The Elmira found at least five other scows hanging, one after the other, off the end of Pier 36. They extended substantially 200 feet out into the river. The wind was northwest, the tide ebb, and the captain of The Elmira says that "someone" on the dock told him to tie up The Roah Hook outside of these other boats and that he accordingly did so, and having done so he left.

■ When the scow arrived and was so moored, the manifest was immediately taken to the operator of the terminal and given to the clerk there, so that full and sufficient knowledge, in my opinion, was thus given to this operator at the terminal and nothing was done to change the berth.

Considering now the question of whether The Erie, as charterer, was negligent in so tying up the scow outside of five other scows at the end of Pier 36 instead of elsewhere, nevertheless, it should here be stated that, in my opinion, this sufficiently did constitute a delivery of the cargo, and transferred the temporary custody of the scow to Agwilines, the operator of the terminal. Palmer et al. v. Agwilines, Inc., 2 Cir., 135 F.2d 689.

At that time the steamship Will Rogers was on the south side of Pier 36 and was being loaded from other lighters in accordance with the then requirements of the stevedores engaged for that work, and the Erie tug could not have placed the scow alongside the said steamship without direct orders from either operator of the terminal or stevedore.

■ The charterer of The Roah Hook was careless when its tug Elmira tied up the scow in such a place for the reason that it was plainly an unsafe place for the scow to remain, possibly for an indefinite time, until it could be shifted to the side of the steamship and there was an adequate and safe berth for this scow along the north side of Pier 36. The approval or even suggestion of the terminal operator did not take away this duty resting on the charterer to use reasonable care for the safety of the scow for, delivery, under the circumstances, could just as well have been made alongside the north side of the said pier.

There are hazy claims made that the waters around this pier were congested by boats, but there is sound evidence not only

that the bargee, who met The Roah Hook when she arrived at Pier 36, protested to various parties, including the captain of The Elmira, that it was unsafe to leave The Roah Hook at the end of this flotilla and asked to have her put on the north side of Pier 36, and also proof of a disinterested witness to the same effect. There is also evidence that subsequently certain barges were indeed placed on this north side of Pier 36. There was only a small steamer near the dock at this place and there is testimony that there was room for at least six barges abreast to be placed on the north side of Pier 36.

All of these protests were of no avail. The captain of The Elmira has no recollection of ever having heard any. Nevertheless, he was an experienced tug captain and, if this court needed any evidence of the lack of safety for the flotilla, the proof is ample that almost immediately after The Roah Hook was so tied up at the end of these boats the up-river line of a boat alongside the end of the pier, which was apparently holding the flotilla, began to break and subsequently, and on several occasions thereafter, covering the period from November 10th to midnight of November 11th, 1943, the flotilla went adrift and had to be shoved back whenever the shifting tugs took out barges or placed barges in this flotilla.

■ It does not seem to me a valid excuse for failure to place the scow in a safe place, where delivery could just as well have been made at a safe place on the north side of Pier 36, to select this unsafe place for such delivery, even if it was at the time considered unobjectional by the operator of the terminal. In other words, a charterer charged with reasonable care over the scow, regardless of any contractual arrangements with others, is not absolved from the duty to exercise reasonable care by the fact that he carelessly agreed with the operator of the terminal to an unsafe place for delivery, when it could have been made with safety on the north side of Pier 36.

■ Accordingly, I do not agree that The Erie, charterer, can escape liability for the damage to the barge itself.

■ The duty of the operator of the terminal to use reasonable care over this scow, temporarily in its custody, as the place of storage of the cargo delivered at Pier 36, for the purpose of being placed on board the steamship when found convenient, was not performed by leaving it placed where it was placed, at the end of the tier of boats, in constant danger of drifting away, and allowing this unsafe berth to remain, although a safe berth was apparently available during the days of November 10th and 11th, and with no protection against a breaking away during the evening or night of November 11th, in the form of some assisting tug or tugs that had repeatedly been called upon during this time, particularly the morning and afternoon of November 11th. This, in my opinion, so far as the scow is concerned, was negligence, contributing to the damage that ultimately was sustained by the scow in again breaking away from the pier.

■ This brings us to the second suit which relates solely to the cargo. This cargo had been delivered at the terminal. The Roah Hook was loaded with cases standing 18 to 20 feet high. These cases were open to the wind and the tides, and the flotilla on several occasions had gone adrift. An examination of the contract, (United States Exhibit No. 7), between the United States by the War Shipping Administration, hereinafter called the Administrator, and the corporation, Agwilines, Inc., which was termed the operator, clearly indicates that the relationship of the parties made the operator an independent contractor, to do and perform all the duties and functions of a terminal operator at Piers 34 and 36, North River. This contract imposed on the operator, Agwilines, Inc., the duties and functions usually and customarily done and performed by a terminal operator. It recognizes "the relation of trust and confidence" established between it and the Government, and required it to use its best judgment in performing the work. With certain exceptions, which do not apply here, the operator agreed to be responsible for damage to cargo, and to take out insurance, and the work of protecting and shifting of cargo,

shifting lighters, scows, etc., and provides, in performing this work, the operator shall be responsible for any injury to cargo arising through the negligence or fault of the operator. The agreement does provide that the operator is not responsible if what he does is the result of direction or interference by the Administrator, but there is no proof here to indicate that in accepting and leaving this flotilla at the end of the pier, in an unsafe place, during the changes of the tide and weather and with knowledge of its breaking away several times from the end of the pier, was caused directly or indirectly by any interference by the Administrator or by the agent, Nichol & Company.

To be sure, the Agwilines denies that The Roah Hook was ever in its custody or care and asserts that it was a mere wharfinger. It agrees however, that it was an independent contractor. There is indication that there was substantial consideration for this relationship. The mere fact that it would be subsequently reimbursed, so far as pay goes, for the wages, expenses, etc., for employees does not, it seems to me, take away from it as the terminal operator the duty to use reasonable care over the cargo and boats in its custody, temporarily storing this cargo, which had been delivered, to its knowledge, at this unsafe place and allowed to continue there. "Independent Contractor" American Bar Institute, Restatement of Law, Agency, Vol. 1, Comment Section 220; 2 Corpus Juris Secundum, Agency, § 2d.

There is also an arrangement in the agreement to indemnify the operator against loss or damage of certain kinds of cargo, which is not here involved, but the agreement also states, "this undertaking of the Government shall not be applicable, where the loss or liability is due in whole or in part to the personal failure to exercise good faith, or that degree of care normally exercised under like conditions in the performance of the operator's peace time commercial operations".

The facts are that this operator accepted the delivery of this cargo and custody of the scow without protest and with full knowledge that the cargo was on The Roah Hook in the flotilla of boats lying at the end of Pier 36, North River. I can find no protest by it that either the scow or cargo should be placed elsewhere, and it is apparent that the operator was satisfied to leave these boats so placed until, from time to time, they received orders from the stevedore that certain of the boats were needed to be shifted to the side of the Will Rogers. When such requests were received, the harbor master would get on a tug and supervise the taking out of the particular barge and then tie up those that were left.

In spite of the repeated breaking away of the flotilla caused, at one time by an accident, and at others caused possibly by the shifting of these individual barges, nevertheless, the cargo was left in the scow at the end of the pier in a flotilla of boats. The operator had used certain assisting tugs during the day of November 11th, which, as I have said, took out a barge or so and then tied up the remaining flotilla to the pier.

About 6 P.M. the stevedores quit work, and those in charge of the operation of the terminal then allowed these assisting tugs to also tie up and stop work.

I can find nothing to indicate the exercise of any reasonable care at all over these barges then remaining at the end of the pier, specifically The Roah Hook with her cargo, with cases high and exposed to the wind and tide as the latter changed. They were just left there for work the following morning. No effort was made to place them on the north side of the pier, although certain barges had been placed there that day, perhaps for the purpose of the small steamship near the dock.

It seems to me, in spite of the able argument by counsel for the operator, that this was a failure to use required reasonable care over the safety of the cargo of The Roah Hook, which subsequently was damaged.

This duty imposed on the operator "as a peace time terminal operator as well as in war time", seems to me, to have required some more reasonable steps to protect this cargo and custody of the scow from what happened, either by simply shifting the cargo and scow to a safer place during the

night on the north side of Pier 36, or by having assisting tug or tugs present to again tie up the flotilla safely to the end of the pier should occasion arise, as was plainly indicated might happen.

Accordingly, it is my opinion, that the subsequent damage to the cargo on The Roah Hook can be traced directly to its failure to use the reasonable care required by the contract on the part of the terminal operator, Agwilines, Inc. If it is not so liable, then the loss would fall directly on the United States, owner of the cargo. I do not find any liability on the part of the Erie, the agent of the ship, the stevedores, or the New York agent of the ship, Nichol & Company, over this cargo so delivered to the terminal.

This disposes of the suits. Libellant, owner of the Roah Hook is entitled to a decree, primarily against the Erie, as charterer. Secondarily, against the Agwilines, Inc., operators of the terminal, for damage to the scow. That the United States, as owner of the cargo on the scow, is entitled to a decree for the damage to the cargo, against the Agwilines, as operator of the terminal.

Submit findings of fact and conclusions of law. I suggest that same be first submitted to the parties here involved, before submission to the court.