**ROAH HOOK BRICK CO. v. ERIE R.
CO. et al.**

**UNITED STATES v. THE ROAH HOOK
et al.**

No. 136, Docket No. 21522.

United States Court of Appeals
Second Circuit.

Argued Jan. 6, 1950.

Decided Jan. 25, 1950.

Chauncey I. Clark, of New York City (Burlingham, Veeder, Clark & Hupper and Hervey C. Allen, Jr., all of New York City, on the brief), for Agwilines, Inc.

Charles W. Hagen, of New York City (Hagen & Eidenbach, Henry C. Eidenbach, and Nelson J. Johnson, all of New York City, on the brief), for Erie R. Co.

William H. Postner, Sp. Atty., Dept. of Justice, New York City (J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y.), for the United States.

Frank C. Mason, of New York City (Mahar & Mason, of New York City, on the brief), for Roah Hook Brick Co.

George A. Garvey, of New York City, for The Jarka Corporation.

James Neil Senecal, of New York City, for Lee & Simmons, Inc., and Simmons, Lee Corporation.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for Carroll Towing Co.

Before L. HAND, Chief Judge, SWAN and CLARK, Circuit Judges.

CLARK, Circuit Judge.

These proceedings in admiralty, which were consolidated for trial below and for this appeal, concern the fixing of liability for damage to the scow Roah Hook and loss of a substantial part of her cargo by reason of the fact that in the early morning of November 12, 1943, she broke away from her berth at Pier 36, North River, and was damaged while drifting down the river. Since the facts found by the district court are supported by the evidence, we are accepting them on this appeal. They appear in substantial part, together with the court's conclusions, in the report appearing in D. C., 77 F.Supp. 840, to which we make reference. We restate briefly the facts we deem essential.

In November, 1943, the United States purchased a large supply of automobile parts in Indiana for shipment by its steamship Will Rogers from Pier 36, North River, to Russia. Accordingly the Erie Railroad Company was engaged to furnish a scow to carry this cargo from the Erie Terminal at Weehawken, New Jersey, to Pier 36 for loading upon the steamship. The Erie used for this purpose the scow Roah Hook, which it had chartered from the owners, the Roah Hook Brick Company. Pier 36 was a terminal operated by Agwilines, Inc., acting as terminal operator under a contract with the War Shipping Administration.

On November 10, an Erie tug brought the scow to Pier 36. The Will Rogers was on the south side of the pier and was being loaded from other lighters in accordance with the requirements of the stevedores. Hanging off the end of Pier 36 one after another were five other scows, extending about 200 feet out into the river. The captain of the tug, acting on instructions from someone on the dock, moored the Roah Hook outside this flotilla, and the scow's

barge gave the manifest immediately to a clerk of the terminal operator. Space was available on the north side of the pier where the Roah Hook could have been berthed.

Before the Erie tug left, another vessel, heading out into the river from the north side of the pier, hit the line holding the inwardmost of the six scows to the pier, causing the line to part and the flotilla to go adrift. The Erie captain at that time obtained a new line and made sure that all lines were secure before departing. During the next two days the flotilla went adrift and had to be shoved back whenever the shifting tugs took out barges or placed barges in the tier of scows.

At 6 p.m. on November 11 the stevedores quit work for the day, and Agwilines permitted the shifting tugs to tie up and stop work. Some time after midnight that night the entire flotilla broke away from the end of the pier and drifted down river. While the scows were drifting free the Roah Hook was damaged, losing overboard a substantial part of her cargo.

The Roah Hook Brick Company, owner of the damaged scow, filed a charter libel against the Erie Railroad for the damage suffered during the charter period. Erie impleaded Agwilines, R. A. Nicol & Co., Inc., the New York agent of the United States, the United States itself, the Jarka Corporation, which provided the stevedores, and the Carroll Towing Company, Inc., which operated the shifting tugs. The Carroll Towing Company then impleaded the owner and the charterer of another tug involved in this activity. The exceptions of the United States having been overruled, The Roah Hook, D.C.E.D.N.Y., 64 F.Supp. 288, it then impleaded Agwilines and the others under Admiralty Rule 56, 28 U.S.C. A. In a second action the United States filed a libel in a cause of contract and cargo damage against the scow Roah Hook, the Erie Railroad, Agwilines, the Jarka Corporation, and the several tugboat owners and charterers. The various proceedings were then tried together.[1]

After trial, the district court found the Erie Railroad primarily liable and Agwilines secondarily liable for the damages to the scow, while it found Agwilines primarily liable and the Railroad secondarily liable for loss of the cargo. In its opinion the court had said that it did not find any liability on the part of the Erie as to the cargo, 77 F.Supp. at page 846; but in its findings and conclusions and decree, several months later, Erie was actually held for the secondary liability just stated. In both libels the action was dismissed as to all other parties. Both the Erie Railroad and Agwilines have appealed from each decree, and the United States and Roah Hook Brick Company have appealed from the dismissal of the other parties to protect themselves in case the decrees against the railroad and the terminal operator should be reversed.

Agwilines argues that the liability imposed upon it should be borne by the United States on the ground that it was a mere wharfinger and never had possession of or a duty toward the scow or cargo. We think, however, that the WARSHIPTERMOP contract between the War Shipping Administration and Agwilines makes it clear that Agwilines was an independent contractor and was to take care of loaded lighters until their turn came to be put alongside the vessel. Thus sec. II(2)(b) of the contract required Agwilines to "* * receive, deliver and handle cargo; do and perform all the duties and functions usually and customarily done and performed by a terminal operator; perform the work" and II(2)(c) promised that Agwilines would "* * * when incident to its terminal operations, shift lighters, barges, scows, cars or carfloats and load and discharge the same." Agwilines agreed in sec. II(6) to be liable for any and all damage arising through its negligence or fault.

Agwilines makes much of the fact that the clerk who received the manifest for the

---

1. In still a third proceeding, tried at the same time, Roah Hook Brick Company petitioned for exoneration from or limitation of liability as owner of the scow Roah Hook; there has, however, been no appeal from the decree granting its petition.

Roah Hook was paid his salary by R. A. Nicol & Co., the government's agent. We think that this would probably be immaterial in any event, and is certainly so in view of sec. II(25) of the contract, which specifically provides that all persons employed in performing the work are the employees of the terminal operator, rather than the Administrator.

■ In sum we conclude that Agwilines was acting as an independent contractor, and that the United States was properly exonerated from liability. And since there is no evidence to indicate that they were in any way at fault, the stevedores, the tugboat companies, and R. A. Nicol & Co. were properly exonerated.

■ The issue, then, lies between Agwilines and the Erie Railroad as to the liability for damage to the scow and the loss of the cargo. Agwilines' principal contention is that the scow was never delivered to it, and that the only proper place where delivery could be made was to the tackle of the Will Rogers. Even though the bill of lading provided for delivery to the ship, nevertheless, as has been said in a different context, "this construction must be interpreted to mean that there shall always be accorded to the carrier a reasonably immediate access to the point of loading or unloading." Circuit Judge Sparks, speaking for the three-judge court in Elgin, J. & E. Ry. Co. v. United States, D.C.N.D.Ind., 18 F. Supp. 19, 23. There was no access to the Will Rogers available here, and yet the scow had to be close at hand so that it might be available when the stevedores were ready for it. We cannot think that it was not enough for the Erie to leave the scow with the terminal operator, hired by the government to receive cargo, until it could be brought alongside the Will Rogers. In Palmer v. Agwilines, Inc., 2 Cir., 135 F.2d 689, we held on facts similar to these that the barge and its contents had come within the actual control of the terminal operator and were thus delivered to the terminal operator. Here, too, the terminal operator had control over and possession of the scow, had accepted the manifest for it, and

had directed it to a particular berth. Thus it was properly delivered to Agwilines.

■ Since the scow had been delivered to Agwilines, the latter had a duty of reasonable care to it. "We have several times decided that the relation of bailor and bailee, *stricti juris,* is not necessary in order to impose upon a consignee, or other person with whom a barge may be left, the duty of reasonable care to protect her until the owner or the charterer takes her back into possession." C. F. Harms Co. v. Erie R. Co., 2 Cir., 167 F.2d 562, 563. Cf. Norfolk Tidewater Terminals v. Wood Towing Corp., 4 Cir., 94 F.2d 164. The court below found that Agwilines had breached this duty by permitting the scow to hang at the end of the dock unprotected when a berth was available at the north side of the pier and when the flotilla had gone adrift several times previously and indicated the possible danger. We have no doubt of the correctness of this holding. Conners Marine Co. v. Besson & Co., 2 Cir., 94 F.2d 572.

Agwilines points out that there is an internal inconsistency in holding it primarily liable for the cargo and the Erie primarily liable for the scow. We agree that the court's Conclusion 5, which held the Erie's carelessness in leaving the scow where it did to be the proximate cause of damage to the scow, and its Conclusion 11, which held Agwilines' negligence the proximate cause of damage to the cargo, cannot both be correct. Whatever caused the scow to be damaged caused the cargo to be lost.

While the Erie may have been careless in accepting the directions to moor the Roah Hook where it did, this carelessness was at best a very remote factor in the accident. To tie a scow to the end of the pier under the prevailing weather conditions was not in itself negligent. Brigham v. Cornell Steamboat Co., 2 Cir., 18 F.2d 92. Indeed, since the Erie moored the scow at the direction of the operator, it might well be held relieved of its duty to determine whether or not the berth was safe. Cf. Cities Service Transp. Co. v. Gulf Refining Co., 2 Cir., 79 F.2d 521; The Mascot, D.C.N.J., 28 F.Supp. 770.

As the findings show, the Erie in fact did more then rely on the directions to moor the Roah Hook at the outside of the flotilla at the end of the pier. When the lines were parted and the scows went adrift while the Erie tug was still on the scene, it took pains to provide new line and to make sure that all the scows were secure. There is no evidence to suggest that the scows might not have remained perfectly safe at the end of the pier had they been left as they were when the Erie tug left. But after the tug had departed, the flotilla went adrift several times as a result of the terminal activities. There is much to indicate that it was this later activity which made the position of the scow perilous, as the terminal operator should have known and remedied. Moreover, when storm warnings were hoisted the next morning—long after the Erie tug had left the scene—Agwilines took no action to safeguard the barge. It should have anticipated the heavy winds and strong ebb tide which doubtless had a part in causing the flotilla to break free. Hence the negligence of Agwilines was the proximate cause of the loss, and the Erie's carelessness, if any, was but a remote condition, not a cause. Thus the inconsistency pointed out in the conclusions below is to be remedied by holding Agwilines primarily liable for the damage to the scow as well as for the loss of the cargo.

Even though damage be not the result of his negligence, a charterer is secondarily liable for damage to a vessel during the charter period. O'Donnell Transp. Co. v. M. & J. Tracy, Inc., 2 Cir., 150 F.2d 735. In accord with this well-settled principle the Erie concedes, and we hold, that it is secondarily liable for the damage to the scow. There is no ground, however, on which to hold it secondarily liable for the cargo which was lost through the negligence of the terminal operator to whom it had made a proper delivery. Moreover, its delivery frees it from any liability as connecting carrier.

The interlocutory decree in favor of Roah Hook Brick Company in the first libel is reversed in part, on the appeal of the Erie Railroad Company, to provide that recovery shall be primarily from respondent Agwilines, Inc., and only secondarily from Erie Railroad Company; in other respects it is affirmed. The interlocutory decree in favor of United States of America in the second libel is reversed in part, on the appeal of the Erie Railroad Company, to provide for the dismissal of the libel against that company; in other respects it is affirmed.