**McALLISTER LIGHTERAGE LINE, INC., as Owner of the SCOW STEELWELD, Libellant,**

v.

**S/S STEEL AGE**

**ISTHMIAN LINES, INC., Claimant-Respondent-Petitioner,**

v.

**MORAN TOWING & TRANSPORTATION CO., Inc., Kirkwood Curtis Bay Co., TUG AGNES A. MORAN, INC., and Universal Terminal & Stevedoring Corporation,**

and

**TUG JAMES T. MORAN and TUG ELIZABETH MORAN, Respondent-Impleaded.**

**ISTHMIAN LINES, INC., as Owner of the Steamship Steel Age, Libellant,**

v.

**The TUG JAMES T. MORAN and Tug Elizabeth Moran, their machinery, boilers, tackle, etc.,**

and

**The Scow Steelweld, her tackle, etc.**

and

**Moran Towing & Transportation Co. Inc., Kirkwood Curtis Bay Company, Tug Agnes A. Moran, Inc., Universal Terminal & Stevedoring Corporation and McAllister Lighterage Line, Inc., Respondent.**

**AMERICAN METAL CLIMAX, INC., Libellant,**

v.

**S/S STEEL AGE.**

**ISTHMIAN LINES, INC., Claimant-Respondent-Petitioner,**

v.

**TUG JAMES T. MORAN, Tug Elizabeth Moran and the Scow Steelweld**

and

**Moran Towing & Transportation Co., Inc., Kirkwood Curtis Bay Co., Tug Agnes A. Moran Inc., Universal Terminal & Stevedoring Corporation and McAllister Lighterage Line, Inc., Respondents-Impleaded.**

**INSURANCE COMPANY OF NORTH AMERICA et al., Libellants**

v.

**The TUG JAMES T. MORAN and Tug Elizabeth Moran, their machinery, boilers, tackle, etc., and the Scow Steelweld, her tackle, etc., and against Moran Towing & Transportation Co. Inc., Kirkwood Curtis Bay Company, Tug Agnes A. Moran, Inc., Universal Terminal & Stevedoring Corporation and McAllister Lighterage Line, Inc., Respondents.**

**Nos. 62 Ad. 1323, 63 Ad. 459, 63 Ad. 556, 63 Ad. 965.**

United States District Court
S. D. New York.
July 16, 1968.

Purdy, Lamb & Catoggio, New York City, for McAllister Lighterage Line, Inc.; Vincent A. Catoggio, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for Isthmian Lines, Inc.; Alexander E. Rugani, Ralph C. Kreimer, New York City, of counsel.

Burlingham, Underwood, Barron, Wright, White & Lord, New York City, for Moran Towing & Transportation Co., Inc., Kirkwood Curtis Bay Co. and Tug Agnes A. Moran, Inc.; Eugene Underwood, Joseph C. Smith, New York City, of counsel.

Brown, Quencer & Commette, New York City, for Universal Terminal & Stevedoring Corp.; Albert S. Commette, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for Insurance Co. of North America et al.; Douglas A. Jacobsen, New York City, of counsel.

Hill, Rivkins, Louis & Warburton, New York City, for American Metal Climax, Inc.; Vincent J. Ryan, New York City, of counsel.

OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

LEVET, District Judge.

GENERAL NATURE OF CASE

The claims in this case grow out of the capsizing of the Scow Steelweld on December 2, 1962 in Erie Basin, Brooklyn, New York.

On December 1, 1962, the Scow Steelweld, owned and operated by McAllister Lighterage Line, Inc. ("McAllister") and

loaded with a cargo of copper shipped and owned by American Metal Climax, Inc. ("Amex"), was towed from Shed 3 in Erie Basin, Brooklyn, New York, by the Tug James T. Moran, owned by Kirkwood Curtis Bay Co. ("Kirkwood") and operated by Moran Towing & Transportation Co., Inc. ("Moran"), and moored alongside the starboard side of the S/S Steel Age, owned by Isthmian Lines, Inc. ("Isthmian"), which was then moored at Shed 4. The Scow Steelweld remained there overnight, abreast the No. 5 hatch of the Steel Age. On the morning of December 2, 1962, the Scow Steelweld was shifted by the Tug Elizabeth Moran, owned by Tug Agnes A. Moran, Inc. ("Agnes"), and others to various positions alongside the Steel Age in connection with cargo operations. While moored alongside the Steel Age and some time before noon on December 2, 1962, the Steelweld listed to starboard, and, although efforts were made to save the scow, shortly before 1:00 P.M. on that day she dumped her load of copper into the water. Much of this cargo was salvaged at considerable expense for reconditioning.

Upon a later survey of the Steel Age it was discovered that two blades of its propeller had been bent and one blade had been broken, and upon survey of the Steelweld it appeared that the Steelweld had been damaged on the bottom and side of its starboard bow. It is stipulated that these conditions were caused by contact between the Steelweld and the propeller blades of the Steel Age, and at issue here is the time, circumstances, and responsibility for such contact.

## ACTIONS

A number of actions in admiralty were instituted, and all were consolidated before trial and referred by a Rule 2 order to the undersigned. They were as follows:

1. McAllister, by libel and complaint filed December 14, 1962 (62 Ad. 1323), sued Isthmian for damages to McAllister's Scow Steelweld, alleged to be $10,000. In this action Isthmian impleaded Moran, Kirkwood, Agnes, the Tugs James T. Moran and Elizabeth Moran and Universal Terminal & Stevedoring Corporation ("Universal"), a stevedoring company employed in loading and unloading cargo from the Steelweld, for damages to Isthmian's S/S Steel Age. (McAllister brought no claim of any kind against the Moran defendants.)

2. Isthmian, by libel and complaint filed April 26, 1963 (63 Ad. 459), sued the two Moran tugs, the Scow Steelweld and Moran, Kirkwood, Agnes and Universal.

Isthmian seeks damages in the sum of approximately $80,000 for the cost of repairs, drydocking, value of loss of use of the vessel during repairs, survey fees and other incidental expenses allegedly resulting from damages to its ship, the S/S Steel Age. Recovery is also sought for the amounts Isthmian was required to contribute as its proportionate share in the general average resulting from the collision, and, as amended by pretrial order entered July 2, 1965, this includes a cause of action as bailee of such much of the cargo on board the Steel Age for which suit has not been brought by others, as well as indemnity for general average contributions which such portion of the cargo was required to make in general average.

3. The libel and complaint filed by Amex on May 16, 1963 (63 Ad. 556) proceeds against the S/S Steel Age and Isthmian asking for damages resulting from the loss and damage to cargo of certain copper ingot bars, wire bars and copper vertically cast cakes and other commodities which were lost through the capsizing of the Scow Steelweld on December 2, 1962. Isthmian impleaded Moran, the Tugs James T. Moran and Elizabeth Moran, Kirkwood, Agnes, McAllister and Universal.

4. The libel and complaint of Insurance Company of North America ("INA") and numerous other insurance companies was filed on September 18, 1963 (63 Ad. 965), and was directed against the Tugs James T. Moran and

Elizabeth Moran, the Scow Steelweld, Moran, Kirkwood, Agnes, Universal and McAllister.

INA's suit seeks recovery of general average contribution. In general, INA has relied upon and adopted the evidence, testimony and contentions of Isthmian, including the proposed findings of fact 1 through 11 as against Moran, and proposed conclusions of law 1 through 5 as against Moran, submitted by Isthmian.

## BASIC CLAIMS OF THE PARTIES

The respective claims set forth in the aforesaid actions may be briefly summarized as follows:

1. McAllister asks recovery against Isthmian for damages to the Steelweld;

2. Isthmian sues McAllister and Universal for damage to Steel Age;

3. Amex sues Isthmian to recover for the loss of copper and the expense of reconditioning that which was salvaged;

4. INA and other insurance companies sue McAllister and Universal for general average contributions made upon behalf of cargo on the Steel Age.

## CONTENTIONS OF THE PARTIES

Simply stated, the contentions of the parties are as follows:

(1) Amex and McAllister claim that the Steelweld and its cargo were delivered to and accepted by Isthmian and were in Isthmian's possession, custody and control when all losses and damages were sustained. Therefore, Amex and McAllister allege that Isthmian is liable to them as consignee or bailee of the Steelweld and as a common carrier of the cargo.

(2) Isthmian denies that the Steelweld and its cargo had been delivered and, therefore, Isthmian maintains that it is in no way responsible to Amex or McAllister. Alternatively, Isthmian avers that even if the scow and cargo had been delivered, nevertheless, all negligence which proximately caused the accident was attributable solely to the Tug James

T. Moran, and Isthmian is still free from all liability.

(3) Moran, in turn, denies that it was negligent in any manner whatever and, further, it denies that it is liable to any other party.

## ISSUES

The resulting issues are:

1. Is McAllister entitled to a judgment against Isthmian for damages to the scow Steelweld?

2. If so, is Isthmian entitled to a claim over against the Moran defendants?

3. Is Isthmian obligated to Amex for loss of cargo?

4. If so, does Isthmian have any claim over against the Moran defendants for such loss of cargo?

The case was tried before the court without a jury.

After hearing the testimony of the parties, examining the exhibits, the pleadings and the proposed findings of fact and conclusions of law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. In the Fall of 1962, a booking agreement for the shipment of a quantity of Amex's copper on the Isthmian Lines ship, Steel Age, was entered into between Isthmian and Amex through Amex's agent, Caldwell & Company, freight forwarders. (Isthmian Ex. 1)

2. During that time McAllister was engaged to transport Amex's copper on the Steelweld for loading on the Steel Age.

3. The freight engagements were stamped with a notice that the copper delivered to Isthmian was to be loaded directly from the Steelweld to the Steel Age. (70, 72;[1] Isthmian Exs. 1A, 1B, 1C, 1E, 1F, 1G, 1H, 1I, 1J, 1M, 1N, 1O, 1P)

---

I. Unless otherwise identified, numbers refer to pages in the trial transcript.

4. Isthmian is a common carrier of merchandise in ocean transportation and States Marine Isthmian Agency, Inc. is the General Agent for Isthmian. (55–56, 204)

5. Isthmian's Traffic Department gave instructions that the Steelweld was to be delivered at Isthmian's Erie Basin Terminal over the weekend of December 1, 1962. (204, 205)

6. The Erie Basin Terminal in Brooklyn, New York is located to the southeast of the southern tip of Manhattan Island. The terminal consists of a complex of warehouses, piers and roadways, somewhat circular in configuration, which surrounds and encloses its harbor area. This harbor area is accessible by sea only through a "gap" at the northwestern side of the terminal complex. (Isthmian Exs. 2, 3)

7. On Saturday, December 1, 1962, McAllister's Steelweld, loaded with Amex's copper, and consigned to Isthmian for carriage to India on the Steel Age, was left at Isthmian's Shed 3 within the harbor area of Isthmian's Erie Basin Terminal complex. (6, stip. No. 9)

8. Papers covering the cargo on the Steelweld were left [2] at Isthmian's office in the Erie Basin Terminal at some time before 1:00 P.M. on December 1, 1962. At about 1:00 P.M. Isthmian's lighterage clerk found the papers on his desk and entered in the lighterage book information concerning arrival of the Steelweld and the nature and amount of cargo expected to be loaded onto the Steel Age from the Steelweld. (81, 84, 89, 99, 100; Isthmian Exs. 4, 5)

9. Before the arrival of the Steel Age at the Erie Basin Terminal, Captain Schaetzle, Isthmian's Pier Superintendent, had given orders to move the Steelweld to alongside the Steel Age. On December 1, 1962, Isthmian's Harbormaster, Policastri, arranged with the Moran Tug Dispatcher to have the Steelweld moved from Isthmian's Shed 3 to alongside the starboard side of the Steel Age

which would be docked port side to Isthmian's Shed 4. (137, 201; PTO ¶ 3(a) (16); Amex Ex. 3, pp. 27–28)

10. After the Steel Age had arrived and while it was being berthed at Isthmian's Shed 4 in the Erie Basin Terminal, the Tug James T. Moran shifted the Steelweld to alongside the Steel Age, and the crew of the James T. Moran handled the lines and threw a heaving line attached to the scow's line up to the ship for mooring the scow to the ship. (564–565)

11. The Steelweld remained moored to the Steel Age abreast of its No. 5 hatch at Isthmian's Shed 4 through the night of December 1, 1962. On the morning of December 2, 1962, Isthmian caused the Steelweld to be shifted to various positions alongside the Steel Age in conjunction with cargo operations. (16–17; Isthmian's Ans. Art. 9)

12. A scow captain employed by McAllister, Walter Moser, was on board the Steelweld at all times while the Steelweld was in the Erie Basin Terminal from the time McAllister left her there on December 1, 1962 to about 1:00 P.M. on December 2, 1962, as required by McAllister. (Isthmian Ex. 12, pp. 8–9, 18–19, 26, 49, 51, 59; Isthmian Ex. 13, p. 20)

13. There is no evidence that the scow captain was vested with any authority or control over the scow's movements or berth. Indeed, his activities were little more than those of a custodian or watchman—though he did periodically check the lines and water. (Isthmian Ex. 12, p. 51)

14. A fair preponderance of the credible evidence shows that actual custody, possession and control of the Steelweld and her cargo were delivered to and assumed by Isthmian at its Erie Basin Terminal at all relevant times after the Steelweld was left at Shed 3 therein on the afternoon of December 1, 1962.

15. While the Steelweld was moored alongside the Steel Age and sometime be-

---

2. Presumably by the Steelweld's captain, Moser, or a member of the crew of the tug which had brought the Steelweld to the Erie Basin Terminal.

tween 10:30 and 11:00 A.M. on December 2, 1962, the Steelweld listed to starboard. (17; Isthmian Ex. 7, pp. 47–48; Isthmian Ex. 12, pp. 58–59; Isthmian Ex. 24, p. 40)

16. Despite Isthmian's efforts at prevention, shortly before 1:00 P.M. on December 2, 1962, the Steelweld rolled on her beam ends and dumped the remainder of her load of Amex's copper into the water. (8, stip. 14; 18, Isthmian Ex. 5, p. 63; Isthmian Exs. 7A, 8B)

17. 3,115 pieces of Amex's copper cargo had been loaded by Isthmian into the Steel Age from the Steelweld before the Steelweld capsized, and Isthmian subsequently issued bills of lading to Amex for the said copper. (92–98, 104; Isthmian Ex. 24, pp. 34–37)

18. After the accident, the Steelweld was found to be holed on her bottom and side at the starboard bow, and the Steel Age was discovered to have sustained two bent propeller blades and one broken blade. (18, 20; McAllister Exs. 1–7, 8–16; PTO ¶ 3(a) (11) and (13))

19. The propeller of the Steel Age and the Steelweld had come into contact, and the holes in the bottom and side at the starboard bow end of the Steelweld as well as the damage to the propeller blades of the Steel Age resulted solely from such contact. (7, stip. 11; 247–248, 296)

20. Between 5:00 P.M. and 5:40 P.M. on December 1, 1962, the Steel Age was in the Erie Basin Terminal harbor area in the process of being docked port side to Isthmian's Shed 4. (124, 132; Isthmian Ex. 6, pp. 10–19; Isthmian Ex. 9, pp. 14–32; Isthmian Exs. 10A, 10B, 10C; Isthmian Ex. 13, pp. 9, 15, 33, 57; Isthmian Exs. 21, 22)

21. At some time during the docking operation of the Steel Age, the Tug James T. Moran, which was ordered and, subsequently, paid for by Isthmian, entered the Erie Basin harbor area, placed the port side of the Steelweld next to the James T. Moran's own port side, and began to shift the Steelweld from Shed 3 to the starboard side of the Steel Age at Shed 4. (132, 137, 139, 557–558; PTO ¶ 3(a) (15); Isthmian Ex. 7, pp. 18–21, 32; Isthmian Ex. 8, pp. 15–18; Isthmian Ex. 13, pp. 10–14)

22. When the James T. Moran and the Steelweld approached the Steel Age on December 1, 1962, the Tug Peter Moran, which assisted during the docking of the Steel Age, was still in position at the Steel Age's starboard quarter to hold the Steel Age's stern into the dock while her lines were made fast. All docking tugs were dismissed by 5:25 P.M., and several minutes later the James T. Moran brought the Steelweld to the starboard side of the Steel Age. (339–340; Isthmian Ex. 7, p. 33; Isthmian Ex. 7A; Isthmian Ex. 9, p. 29; Isthmian Ex. 13, pp. 34, 36)

23. During the docking operation on December 1, 1962, five men were on the stern of the Steel Age and five men were in or around the engine room of the Steel Age. There is, however, no proof that either these men, the Captain of the Steel Age, the Captain of the Steelweld, or anyone else heard, recorded or felt any unusual noise or impact when the Steelweld came alongside the Steel Age. (100, 341, 569; Isthmian Ex. 6, pp. 32, 40; Isthmian Ex. 7, pp. 11, 63; Isthmian Ex. 8, p. 10; Isthmian Ex. 10, pp. 9–14, 22; Isthmian Ex. 12, p. 43)

24. If, during the docking maneuvers, the propeller of the Steel Age rotating on main engine had come into contact with the Steelweld, such contact would have been felt upon both the Steel Age and the Steelweld. (307–309, 470–471)

25. It has not been established that any damages at issue herein occurred during the docking operations of the Steel Age and the shifting of the Steelweld on December 1, 1962.

26. During his routine check at 6:30 A.M. on December 2, 1962, the Steelweld's captain, Moser, found no water in her, and the Steelweld was on an even keel at 8:00 A.M. of the same morning. (198; Isthmian Ex. 12, pp. 52–53)

27. At 8:00 A.M. on December 2, 1962, the Steelweld had, under Isthmian's order, been carelessly placed hard up un-

der the overhang or "counter" at the stern of the Steel Age, in close proximity to the propeller. (196–200, 363–366, 387, 463–465; Isthmian Ex. 8L; Isthmian Ex. 24, p. 21; Isthmian Ex. 24A; Moran Exs. 1, 9)

28. The Steelweld's draft afloat with 450 to 500 tons of copper aboard was approximately 6 feet, and the draft of the Steel Age at her stern was approximately 23 feet and 3 inches. In a horizontal position, the end of each ten-foot blade of the Steel Age's propeller was 13 feet below the surface of the water, and when approaching a vertical position the blade ends would move close to the surface of the water. The total weight of the Steelweld and her cargo was about 600 tons, a mass of more than one million pounds. Afloat alongside the Steel Age, she was obviously subjected to some forces of wind, current and swells. (245, 442–443, 448–449)

29. The irregular nature of the damage to the propeller blades of the Steel Age is consistent with contact with the Steelweld while it drifted lazily in, out, over and against said propeller blades which were slowly turned under the jacking gear on December 2, 1962. (186–189, 322, 451–452; Isthmian Ex. 6A; Isthmian Ex. 10, pp. 20, 29, 62–66; Isthmian Exs. 10A, 10B, 10C; Isthmian Ex. 11, pp. 12, 22; PTO § 3(a) (12))

30. A fair preponderance of the credible evidence shows that it would have taken two to three hours for the Steelweld to list after she was holed. (265–268, 301–302, 453–458; INA Ex. 6, p. 5)

31. A fair preponderance of the credible evidence demonstrates that the holing of the Steelweld which was caused by contact with the propeller of the Steel Age (Findings 18, 19) occurred during the morning of December 2, 1962 at some time near 8:00 A.M.

32. Universal was a stevedore employed by Isthmian to load cargo aboard the Steel Age.

33. Universal did not commence cargo operation aboard the Steelweld until late in the morning of December 2, 1962. (Isthmian Ex. 24, p. 35)

34. A fair preponderance of the evidence shows that Universal was not involved in any way with the collision between the Steel Age and the Steelweld.

35. Isthmian has not proved by a fair preponderance of the credible evidence that the damage to the Steelweld and the loss and damage to Amex's copper shipments was not the result solely of Isthmian's negligence or that said losses and damages were due to an excepted cause relieving Isthmian of liability.

## DISCUSSION

### A. DELIVERY TO ISTHMIAN

The evidence is clear that the Steelweld loaded with Amex's copper cargo had been delivered to Isthmian by the time that the damage and other losses at issue here occurred. (Finding 14)

In Palmer v. Agwilines, Inc., 135 F.2d 689 (2nd Cir. 1943), it was held that delivery of a scow had taken place when " * * * the respondent had access to both vessel and cargo, had already removed some of the cargo and was using the barge as its own facility for storage of the goods pending their removal and transfer to one of its steamers. * * * [i. e., when] the barge and its contents had come within the actual control of the respondent at its terminal." 135 F.2d at 691. Furthermore, additional evidence of delivery includes acceptance of the scow's papers and direction of a scow to a particular berth, Roah Hook Brick Co. v. Erie R. Co., 179 F.2d 601, 604 (2nd Cir. 1950); and, orders by the ship to tie a scow alongside, and control by the ship of the place and speed of loading operations from the scow, Mackey v. United States, 197 F.2d 241, 243 (2nd Cir. 1952).

In addition, presence of a barge "captain" aboard a scow need not militate against a conclusion that delivery of the scow and its cargo has been completed, for such employees " * * * are no more than laborers or deckhands

and are not to be looked upon as shipmasters." Hutton Company v. Arrow Builders Supply Corp., 371 F.2d 944 (2nd Cir. 1967) Clearly, actual possession, custody and control of a scow by a third party is not inconsistent with the existence of an employee upon the scow whose duties are largely custodial and who lacks any authority over the movements, placement, or other events which affect his scow. (See Finding 13)

In the face of proof that all elements requisite to a determination that delivery of the Steelweld to Isthmian had, in fact, taken place (see Findings 6–14, 17), Isthmian contends, nevertheless, that certain additional factors are of import sufficient to require the contrary conclusion. With these contentions I do not agree.

First, Isthmian urges that inasmuch as the freight engagements for Amex were stamped "IMPORTANT. FOR LOADING DIRECT FROM PRIVATE LIGHTER INTO VESSEL" (see Finding 3), nothing was delivered to Isthmian until placed into the ship's tackle. In this argument, however, Isthmian has overlooked the rule in Roah Hook Brick Co. v. Erie R. Co., supra.

In Roah Hook, under circumstances similar to those now before the court, it was held that even where the bill of lading itself provided for delivery to the ship, * * * this construction must be interpreted to mean that there shall always be accorded to the carrier a reasonably immediate access to the point of loading and unloading." 179 F.2d at 604. There the court reasoned that, when access to the ship is not presently available and when a scow must be close at hand in order to avoid delay to loading operations once they would commence, then the leaving of a scow at the terminal is delivery enough.

The facts here are, at least, equally compelling. In the instant case, the Steelweld was brought to Isthmian's Erie Basin Terminal at the time specified by Isthmian (Findings 5, 7, 8), but Isthmian's Steel Age had not yet arrived.

(Finding 20) Isthmian's clerk received the Steelweld's papers, made the normal entries in the lighterage book, and arrangements were made and carried out by Isthmian to shift the Steelweld to the Steel Age at the earlier possible time to facilitate loading operations. (Findings 9, 10, 11, 21, 22)

Furthermore, the freight engagements herein state that Amex's cargo was to be "LOADED" directly onto the ship, and, contrary to Isthmian's assertion, there is a material difference between this and "delivery." In the present context, "for loading into the vessel" stands for no more than a mere direction not to place the Steelweld's cargo onto Isthmian's pier before it was to be taken aboard the Steel Age. This is both reasonable and entirely consistent with a prior delivery of the scow and cargo to Isthmian.

Isthmian next maintains that inasmuch as Amex accepted without protest bills of lading covering only the small portion of its copper which was taken aboard the Steel Age before the Steelweld capsized, such acceptance is tantamount to an admission by Amex that delivery to Isthmian was effective only to the extent evidenced by said bills of lading. Here, too, though, the rule is contrary.

It is clear that "[T]he giving of a bill of lading is important evidence that the custody of the goods has been taken by the carrier *but is neither essential nor conclusive.*" Inland Waterways Corp. v. Standard Commercial Tobacco Co., Inc., 65 F.2d 715, 717 (5th Cir. 1933). (Emphasis supplied) See also Mackey v. United States, supra, 197 F.2d at 243. Indeed, Isthmian's own authorities hold that bills of lading are not conclusive proof of delivery or the lack thereof. See Strohmeyer & Arpe Co. v. American Line S.S. Corp., 97 F.2d 360 (2nd Cir. 1938); Missouri Pacific Railway Co. v. McFadden, 154 U.S. 155, 14 S.Ct. 990, 38 L.Ed. 944 (1894).

Thus, the thesis that non-delivery is proved by Amex's acceptance without protest of bills of lading for only a small

portion of its copper is false. Since the pertinent inquiry is whether the Steelweld and its entire cargo had been delivered to Isthmian Lines—not just to the Steel Age, consideration of the amount of copper which actually survived Isthmian's loading operations is irrelevant.

Finally, Isthmian avers that all its actions regarding the Steelweld were undertaken solely for the purpose of avoiding liability to Amex which might arise from "shutting out" the Steelweld's cargo, and, therefore, such conduct should not be taken as evidence that delivery had, in fact, taken place. This argument, of course, contradicts itself.

If delivery by McAllister was truly incomplete, and if Isthmian did not have actual control and possession of the Steelweld, then, obviously no liability for "shutting out" the Steelweld's cargo could arise. Furthermore, had there been any substance to this argument, surely Isthmian could have left the Steelweld at Shed 3 and informed McAllister that McAllister should arrange to have the Steelweld shifted to the Steel Age. Instead, Isthmian took it upon itself to arrange for the Steelweld's shifting and mooring to the Steel Age—even before the Steel Age had arrived at the Erie Basin Terminal. (Finding 9)

Isthmian has shown nothing to controvert the evidence that, at all relevant times herein, the Steelweld and its cargo were in Isthmian's possession, custody and control, and that the Steelweld and its cargo had, in fact, been delivered to and accepted by Isthmian.

## B. LIABILITY

Having determined that the Steelweld and its cargo had been delivered to Isthmian, the sole question remaining at this time is that of Isthmian's liability for the loss and damage which occurred after said delivery.

■ Since Isthmian is a common carrier (Finding 4), its liability must be determined by the well-established principle that " * * * the burden rests upon the carrier of goods by sea to bring himself within any exception relieving him from the liability which the law otherwise imposes on him." Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934). See also The Propeller Niagara v. Cordes, 62 U.S. 7, 16 L.Ed. 41 (1858). In Missouri Pacific Railroad Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964), the Supreme Court held that " * * * under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability," 377 U.S. at 138, 84 S.Ct. at 1145. Though the Elmore & Stahl case dealt with railroads, its holding was specifically applied to maritime cargo claims in Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2nd Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

■■ Isthmian was also obliged to exercise care in its handling of the Steelweld, which was in Isthmian's actual possession, custody and control, since " * * * the relation of bailor and bailee, stricti juris, is not necessary in order to impose upon a consignee, or other person with whom a barge may be left, the duty of reasonable care to protect her until the owner or the charterer takes her back into possession." C. F. Harms Co. v. Erie R. Co., 167 F.2d 562, 563 (2nd Cir. 1948).

Isthmian has attempted to meet the burden of proving its freedom from liability by propounding a theory that all negligent actions which proximately caused the accident herein were those solely of the Tug James T. Moran and its crew. Isthmian, however, has failed to sustain its burden.

In essence, Isthmian asserts that the only contact between the Steelweld and

the propeller of the Steel Age occurred on December 1, 1962 during a one-minute interval between 5:14 and 5:15 P.M., when the Steel Age's propeller was turning astern under main steam as the ship was being docked at Isthmian's Shed 4 in the Erie Basin Terminal. Isthmian's contention is that the Tug James T. Moran had, at that time, towed the Steelweld from Shed 3 and brought it over the ship's propeller when maneuvering the scow for mooring to the Steel Age. This argument is weak.

To begin, Isthmian has not proved with any degree of accuracy the precise time at which the Steelweld was brought to the Steel Age on December 1, 1962. Obviously, this is particularly damaging since, as noted above, Isthmian's allegation that Moran must bear sole responsibility for the accident is bottomed upon the hypothesis that contact between the Steelweld and the propeller of the Steel Age took place only during the one minute when the Steel Age's propeller turned astern on December 1, 1962. Rather than review all of the conflicting testimony in the record of this lengthy trial, it is sufficient to note that the Steelweld was not brought alongside the Steel Age until after the docking tug, Peter Moran, had left the ship, and the Peter Moran was not dismissed before 5:25 P.M. (Finding 22)

Further undermining Isthmian's claim against Moran is Isthmian's failure to adequately explain why no witness heard, felt or recorded an impact between the Steel Age's huge propeller rotating under main steam and the steel hull of the Steelweld. (Findings 23, 24) I agree with Judge Woolsey's observation in The Cristobal Colon, 36 F.2d 825, 826 (S.D. N.Y.1929) that:

> "If there had been a contact * *, it seems to me quite incredible that it would not have been noticed by some one, either on the steamship or on the tugs which were docking the steamship, and that the bargees would not have been vocable in regard to their injuries."

Finally, despite proof that the damage to the Steelweld's bottom was of a nature such that the Steelweld would list within two to three hours after said damage occurred (Finding 30), Isthmian has not explained why the Steelweld did not, in fact, list until approximately eighteen hours after the time Isthmian asserts it came in contact with the propeller of the Steel Age. Though Isthmian speculates that something must have plugged the hole during this period of time—perhaps the broken portion of the Steel Age's propeller blade which never was recovered, Moran has adduced persuasive proof to the contrary. Indeed, it is somewhat more probable under all of the circumstances herein, that the crack in the Steelweld's hull was caused by a force applied at an indentation to the right of the crack which stretched the plate until it cracked. (See McAllister Ex. 4, No. 4) There was no evidence that the plate had been set up at the point of the crack, and this would have been the case had the propeller blade contacted the Steelweld's hull at that point.

 Thus, based upon all the evidence submitted, it cannot be said that Isthmian has met its burden of proving by a fair preponderance of the credible evidence that Moran was in any way responsible for the accident. Since Isthmian has conceded that the Tug Elizabeth Moran (which shifted the Steelweld at some time on December 2, 1962) was free from all liability (634), and since Isthmian has failed to overcome Moran's proof that no contact between the Steelweld and the propeller of the Steel Age occurred on December 1, 1962, when the James T. Moran was present, all actions against Moran must be dismissed. See Stevens v. The White City, 285 U.S. 195 (1932). Furthermore, Isthmian is liable to Amex for breach of its obligations as a common carrier, and Isthmian is liable to McAllister for breach of its duty of reasonable care as bailee or consignee of the Steelweld. See Findings 27–31, 35; C. F. Harms Co. v. Erie R. Co., supra.

## CONCLUSIONS OF LAW

1. Actual control, possession and custody of the Scow Steelweld and the copper cargo on the scow had been delivered to and assumed by Isthmian Lines, Inc. at the time that the propeller of the S/S Steel Age contacted and holed the Scow Steelweld and at the time of the loss and damage to said copper.

2. Isthmian Lines and the S/S Steel Age are liable to American Metal Climax, Inc. for loss and damage to the copper that was on the Scow Steelweld.

3. American Metal Climax, Inc. is granted judgment for its losses and damages against the S/S Steel Age and Isthmian Lines, Inc., together with costs and disbursements. (Interest to be subsequently determined.)

4. Isthmian Lines, Inc. and the S/S Steel Age are liable to McAllister Lighterage Line, Inc. for damage to the Scow Steelweld.

5. McAllister Lighterage Line, Inc. is granted judgment for its damages against the S/S Steel Age and Isthmian Lines, the libel and impleading petitions of Isthmian Lines are dismissed and the libel of Insurance Company of North America and others is dismissed, all with costs and disbursements to McAllister Lighterage Line, Inc. (Interest to be subsequently determined.)

6. No negligent acts or omissions on the part of Moran or any of its tugs have been proved.

7. The libels and impleading petitions are dismissed as to the Tugs James T. Moran and Elizabeth Moran, their corporate owners and Moran Towing & Transportation Co., Inc. with costs and disbursements to Moran.

8. The libel and complaint of McAllister Lighterage Line, Inc. in which Isthmian impleaded Universal Terminal & Stevedoring Corporation is dismissed as to Universal with costs and disbursements to Universal.

9. The libel and complaint of Isthmian Lines, Inc. against Universal Terminal & Stevedoring Corporation is dismissed with costs and disbursements to Universal.

10. The libel and complaint of American Metal Climax in which Isthmian impleaded Universal Terminal & Stevedoring Corporation is dismissed as to Universal with costs and disbursements to Universal.

11. The libel and complaint of Insurance Company of North America, et al., against Universal Terminal & Stevedoring Corporation is dismissed with costs and disbursements to Universal.

Pursuant to a direction of the court at the commencement of the trial of this case; damages were reserved in accordance with F.R.Civ.P. 42(b). This phase of the case will be tried to the court and will appear on the Fall Calendar of the undersigned. Interest due is also reserved for subsequent determination by the court.

Enter interlocutory decree on notice pursuant hereto.

