C. F. HARMS CO. v. ERIE R. CO. et al.

No. 224, Docket 20935.

Circuit Court of Appeals, Second Circuit.

April 28, 1948.

Gilbert S. Fleischer, of New York City, and J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y., for appellant.

Charles W. Hagen, of New York City, for Erie R. Co.

Christopher E. Heckman and Foley & Martin, all of New York City, for libellant.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The United States appeals from a decree in the admiralty, awarding damages against it for injury to a scow belonging to the libellant and chartered to the Erie Railroad. The libellant sued the Erie Railroad as charterer; and the Railroad impleaded the United States under the Tucker Act,[1] alleging that the scow was damaged while "under the complete control and direction of the Government." The facts as found by the judge were as follows. The libellant on September 7, 1943, chartered the scow, then in sound condition, to the Railroad. A year later—September 13, 1944—the Railroad received written orders from an officer of the Army in charge at the "base" as Stapleton, Staten Island, to deliver a shipment of Army "half-tracks" then at Weehawken, New Jersey, to Pier 13, Stapleton, on September 14th. The Railroad laded the "half-tracks" on the scow, and one of its tugs towed her to Pier 13, where she arrived at 1:45 P.M. on the 14th. The tug master reported to the Army's tug despatcher at Pier 13, who ordered him to put the scow on the north side of Pier 14, at a safe inside berth; and the tug towed her thither, making her safely fast outside an Army barge about three berths' length from the bulkhead. Since the bargee was not on board at the time, the tug's deckhands made fast the lines, using all that were then available. The weather was not stormy at the time, and, as the wind was from the southeast, the north side of the pier was safer than the south. However, on the 14th it was known that a hurricane was approaching New York Harbor, and by two P.M. on that day it was already north of Norfolk, Virginia. It struck New York Harbor late in the evening of the 14th—the wind rising in gusts to ninety-nine miles per hour, greater than any velocity theretofore recorded.

On the 16th the bargee, on looking for the scow found her, not at the Army "base" at Stapleton, but at another "base" in Brooklyn, whither the libellant had directed him to go. The judge found that an Army tug had towed her there on the 15th, and, although there was no express evidence to that effect, this is the necessary inference. The "half-tracks" were still on board, and an Army tug later took her back to Stapleton where she was discharged. When the bargee boarded her on the 16th she had suffered the injuries for which the libellant sued, and the judge's conclusion that she suffered them after she broke adrift at Pier 14—which the United States conceded that she did—was not only reasonable, but inevitable. However, the record contains no evidence as to when she did break away, or how she came from Stapleton to Brooklyn.

The first question of law is whether the United States was under any duty to protect her after her delivery at Pier 14. We have several times decided that the relation of bailor and bailee, stricti juris, is not necessary in order to impose upon a consignee, or other person with whom a barge may be left, the duty of reasonable care to protect her until the owner or the charterer takes her back into possession. New York Trap Rock Corporation v. Christie Scow Corporation[2] was the last of these decisions and in it we reviewed the earlier ones from the outset and reasserted the doctrine, first somewhat tentatively put forward thirty years ago in The William Guinan Howard.[3] We concluded (162 F.2d at page 627) that "the degree of care * * * usually must be gathered by reconstructing the relations between the parties in their entirety," which is as definite a general statement as can safely be ventured. Our earlier decision in Conners Marine Co. Inc. v. Petterson Lighterage & Towing Corporation,[4] is not distinguishable upon the facts from the case at bar, and perhaps it would have been enough merely to refer to it as authority; but, in view of the earnestness of the present appeal, we have thought it desirable to do more.

As already appears from the findings, "the relations between the parties in their

[1] § 41(20), Title 28 U.S.C.A.
[2] 2 Cir., 162 F.2d 624.
[3] 2 Cir., 252 F. 85.
[4] 2 Cir., 151 F.2d 662.

564

entirety" were that an Army officer, in charge of transporting munitions to the theatre of war, directed the tug to make the scow fast at Pier 14, and after the tug had done so, declared himself satisfied. There she lay, and there she had to lie, as both parties knew, until the Army chose to move her; the Railroad had done all that was required of it; it had no power to speed up her discharge, or to move her away; indeed it was not allowed even to know whether she would be taken to unlade, or what ship was to lift her cargo. Flagrante bello, all such movements were carried on under the most rigorous and imperative secrecy. The Army had its own tugs, which moved about such scows as need was, and would have brooked neither interference, nor even inquiry. Thus the Railroad was deprived of all means of performing its duty as charterer to protect the scow; it had the choice either of refusing to deliver the "half-tracks" at all, or of trusting to such protection as the Army might give. The officer in charge at Stapleton knew these facts as well as the Railroad; collectively they constituted "the relations between the parties in their entirety," and the question is what mutual, though unexpressed, understanding should be imputed to them; in other words, what duty would the Railroad have exacted which the Army would have accepted, had both been faced with the question whether the Railroad or the Army should move the scow to a place of safety, if her berth became dangerous? The mere statement of the question appears to us to be its answer.

 Had a private corporation been in the position of the Army, it would not have been necessary to decide whether this was a duty sounding in contract, or "sounding in tort" in the words of the Tucker Act;[5] but it is necessary because that act grants jurisdiction to the district court only in cases sounding in contract. Moreover, although the jurisdiction does include cases

of "implied," as well as "express," contracts, the Supreme Court in a long line of decisions has settled it that the contract must be one "implied in fact" and not "in law."[6] That distinction was derived from the long established fiction—originally necessary because of ancient paucity of common-law writs—of describing certain obligations imposed without the obligor's consent, which courts found necessary to avoid injustice, as "contracts" of some sort. Whether one calls them "quasi-contracts," or "contracts implied in law," is not important, except as the second phrase serves more to disguise their origin and character. The important fact is that they do not depend upon the obligor's consent; and, indeed, are usually imposed to thwart his purpose. Generally it would be a barren inquiry whether the "relations * * * in their entirety" made out a bailment, properly speaking, for the duty is the same. In the case at bar, however, unlike those in most, if not all, decisions of which we have spoken, it is necessary that the "relations" should constitute a bailment, because the evidence does not disclose what precautions, if any, the officers and their assistants at Stapleton took to protect the scow; and unless the burden of proof was on the United States the case was not proved; and the burden of proof is ordinarily upon the defendant in such situations, only if he is a true bailee; though that may not be an absolutely inflexible limitation. Be that as it may, here it seems to us that there was a bailment, view the evidence as one will. The Army's control was unconditional; it need ask no leave of the Railroad for anything it might do; it could move the scow whither and when it chose; discharge her, or hold her, as it pleased. This the officer in charge understood; the Railroad understood; and each knew that the other so understood; and we can find nothing lacking which is essential to a bailment. Moreover, although none of this was expressed,

---

[5] § 41(20), Title 28 U.S.C.A.

[6] Tempel v. United States, 248 U.S. 121. 39 S.Ct. 56, 63 L.Ed. 162; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099; Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643; United States v. Minnesota Mut. Inv.

Co., 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911; United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260; Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 394-396, 59 S.Ct. 516, 83 L.Ed. 784.

all of it grew out of a mutual accord of purpose, and the legal sanction extended no further than the fulfillment of that purpose: the "obligation" was limited to the "intent." We have no doubt that, had the libellant recovered from the Railroad for the damage, the Railroad could have recovered in a direct suit in the district court against the United States as a bailee in the most literal sense, and as a bailee under a "contract implied in fact."

That it might sue in the admiralty upon such an obligation is proved by the very words of the Tucker Act [7]—"in a court of law, equity or admiralty"; and other sections of the same Title lay down the method of asserting jurisdiction,[8] which was followed in the case at bar. The only objection which the United States raises, or which we can perceive, is that the Supreme Court in United States v. Sherwood,[9] refused to allow a judgment creditor to collect a claim of the judgment debtor against the United States, by joining it and the judgment debtor in a single action brought under § 795 of the New York Civil Practice Act. The reason for that was that under the New York statute the judgment debtor was free to challenge the right of the judgment creditor to sue in his name, thus introducing a double litigation which was not permissible in the Court of Claims, whose jurisdiction alone the Tucker Act [10] conferred upon the district court. That

reasoning does not apply to the situation at bar. The suit inaugurated by the Railroad's petition bringing in the United States, is in no sense derivative from, or dependent upon, the suit of the libellant against the Railroad. The Railroad, as bailee of the barge, like all bailees, had standing to recover full damages for injuries to the chattel bailed. This is well-settled law when the bailee sues in tort;[11] and in Pendleton v. Benner Line,[12] the bailee was allowed to recover for breach of the owner's warranty of seaworthiness—an action traditionally viewed as one sounding in contract. As Holmes, J., said in that case (246 U.S. at page 356, 38 S.Ct. at page 331, 62 L.Ed. 770): "The ground upon which bailees have been allowed to recover the full value of goods from wrongdoers has been stated for centuries to be their liability over. Y.B. 9 Ed. IV, 34, pl. 9, is an example of what has been repeated from that day to this." Obviously, there can be no distinction in theory between an action by the bailee in tort or in contract, if this be the basis of his right in either.[13]

The Railroad was however secondarily liable under well established law.[14]

Decree affirmed against the United States.

Decree in favor of the Erie Railroad reversed; a decree holding it secondarily liable to be entered.

---

[7] § 41(20), Title 28, U.S.C.A.

[8] §§ 762 and 763, Title 28 U.S.C.A.

[9] 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058.

[10] § 41(20), Title 28 U.S.C.A.

[11] The Beaconsfield, 158 U.S. 303, 15 S. Ct. 860, 39 L.Ed. 993; Cornell Steamboat Co. v. The Jersey City, 2 Cir., 51 F. 527; National Surety Co. v. United States, 8 Cir., 129 F. 70; The W. C. Block, 2 Cir., 71 F.2d 682.

[12] 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770.

[13] White v. Bascom, 28 Vt. 268; Swift v. Pacific Mail S. S. Co., 106 N.Y. 206, 12 N.E. 583; Bruen v. Kansas City Agricultural, etc., Fair Ass'n, 40 Mo.App. 425; Colvin v. Fargo, 47 Misc. 642, 646, 94 N.Y.S. 377.

[14] O'Donnell Transp. Co. v. M. & J. Tracy, Inc., 2 Cir., 150 F.2d 735.