**F. E. GRAUWILLER TRANSP. CO., Inc. v. GALLAGHER BROS. SAND & GRAVEL CORPORATION et al.**

**THE SHERLIE.**

No. 122, Docket 21125.

United States Court of Appeals
Second Circuit.

April 5, 1949.

Max Rockmore, of New York City for appellant Thomas Henry Material Co.

William M. Smith, Foley & Martin, Alexander & Ash, and Gerald E. Dwyer, all of New York City, for appellees.

Christopher Heckman, of New York City, for appellee Gallagher Bros. Sand & Gravel Corporation.

Edward Ash, of New York City (Sidney A. Schwartz, of New York City, of counsel), argued for appellee Shamrock Towing Co.

Gerald E. Dwyer, of New York City, for appellee New York Central R. Co.

BEFORE L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

The Thomas Henry Material Company appeals from a decree in the admiralty, holding it primarily liable for the sinking of the libellant's deck scow, Sherlie, on April 11, 1946, while moored off Pier 15, West New York, New Jersey. The libellant, owner of the scow, sued the Gallagher Sand & Gravel Corporation, the charterer; that corporation brought in the Shamrock Towing Company, Inc., whose tug had left the scow at the pier, and the Shamrock Company brought in the Henry Company, the lessee of the pier, and the West Shore Railroad, its owner, for which the New York Central Railroad Company was later substituted. The judge held the charterer secondarily liable, but dismissed the suit against the Shamrock Company and the railroad. The question is whether the Henry Company is liable, or the tug, or both.

The libellant chartered the Sherlie to the Gallagher Corporation under the usual oral New York harbor charter, and on April 1, 1946, the Henry Company ordered from the charterer a mixed load of sand and gravel to be delivered during the morning of April 11, 1946, at Pier 15. Originally the pier had been part of a larger pier; but the further end had been abandoned, so that in April, 1946, the decked part of the pier extended only 240 feet out from the bulkhead. Beyond it, jutting out into the river for some 400 feet further, was a bed of spiles, partially exposed at low tide, upon which the abandoned deck used to rest. The tug arrived off the slip at about 4:25 P.M., and, as she approached, it became apparent that she could not take the barge into the slip. On the opposite and northerly side of the slip was a steamer, the William Patterson, moored to a coal pier, bows in, and between her and the bulkhead was the scow, Norton. The northerly side of Pier 15 was occupied by the scow, Thomas McGeeney, which had the in-shore berth, and astern and outshore of her, was the scow, Port Jefferson No. 11. Both of these were moored bows in, and the Sherlie could not be shoved between their starboard side and the port side of the William Patterson; for there was no more than ten feet of open water available. The tug, therefore, pushed the Sherlie along the north side of Pier 15 until her bow touched the stern of the Port Jefferson; and the bargee ran a line from his port bow corner to a cleat on Pier 15 and another line from his starboard bow corner to the starboard stern corner of the Port Jefferson. Since Pier 15 extended only eight or ten feet beyond the stern of the Port Jefferson, more than 100 feet of the Sherlie's length were tailing out of the slip, and on her portside were the spiles just mentioned. This was just after flood tide. The bargee swore that, at once after arriving in the slip, he went to the Henry Company's office, reported his arrival, returned to the scow at 5:00 P.M., and turned in at about 9:00 P.M. The Sherlie was then apparently in good shape, but at about 10:00 P.M. he realized that she was careening to port, scrambled out of his cabin and dove over the after rail. She capsized completely, so that her deck rested on the bed of spiles; and later examination showed that she had a hole in her port stern corner caused by a piece of spile twelve inches wide and six inches long, which was later found in her hold.

██ The negligence of the tug is beyond debate, and so the judge found. Indeed, it was most gross; for, since the Sherlie

was 112 feet long, over nine-tenths of her length lay beyond the end of the pier and close alongside the broken spiles. The ebb tide had a leverage upon her outer end which made it most probable that the fasts by which she was moored to the pier and to the Port Jefferson, would either render or part. However, the judge excused the tug because he found that the Henry Company was solely responsible. He first found that some of its employees, wishing to move the Port Jefferson across the slip to the opposite pier and to place her between the bows of the Patterson and the bulkhead, cast off the fasts of the Sherlie. For this conclusion he relied upon the testimony of the bargee of the Port Jefferson, who had left the scow that morning, and who swore that, when he came back at midnight, he found the Port Jefferson in the Norton's former berth, the McGeeney in the Port Jefferson's former berth and the Norton in the McGeeney's. The judge concluded that Henry Company's employees must have shifted all these barges sometime between 9:00 P.M. and 12:00 P.M., and, in doing so, had cast off the fasts of the Sherlie and set her adrift.

■ This conclusion presupposes that after working hours, indeed at dead of night, when all the operating employees had long since gone home, this complicated and difficult shift of barges took place for no conceivable reason. The story would be well-nigh incredible, even if the bargee's testimony had been more persuasive than it was, but in fact his memory was obviously most unreliable. The judge found confirmation of it, however, in certain photographs which showed the Port Jefferson in the Norton's berth across the slip, the McGeeney in the Port Jefferson's and another barge—presumably the Norton—next the bulkhead. These photographs did indeed bear the legend: "4-12-46," but the photographer was not called, and we do not know when in fact they were taken. The only testimony about them is that they represented the position of the barges on the 13th. On the other hand, one of the witnesses for the Henry Company swore that the McGeeney had not been moved by the morning of the 12th, and the testimony of the bargee of the McGeeney, although confused, can only mean that his barge was moved after the Sherlie had capsized. Moreover, even though the photographs were taken on the 12th, we do not know at what time on that day they were taken, and if it was in the afternoon, it is altogether possible that the shift had been in the morning. Finally, although, as the judge says, the Henry Company may not at the trial have disputed the charge that the Sherlie had been cast off, it most vigorously disputes it now. The Shamrock Company had the burden of proving that the Henry Company was guilty of this intervening fault, and we hold that it failed in carrying it.

■ The second question is whether the Shamrock Company proved that the Henry Company accepted the Sherlie from her bargee, when she arrived at about 4:25 P.M. on the afternoon of the 11th, with knowledge of her perilous position. The bargee said that he went to the office and had some talk with persons whom he found there. The general character of his testimony best appears by quoting it verbatim: "Boss is in that office yet * * * Well, he says all right." "Man—man was behind the counter there. There was a couple of them bosses there, you know, busy. They was busy * * * They was busy writing and I says, 'Scow Sherlie is here with sand and gravel.' Well, he first looked at me and he says, 'All right, all right, Captain,' and I walked away." After the Henry Company had contradicted this testimony, he was recalled and said: "I went up to the office and I see a couple of men * * * I don't know if it was the engineer or working men; they was standing on the dock, by that little derrick there." When he got to the office, these men had disappeared, but "there was two men behind the counter, and three men standing outside the counter. They were busy inside with the writing * * * One of the men he don't recognize me very much, but he said, 'That is all right.'" We assume that the judge accepted this testimony, and we are concluded by it, for, unlike the testimony of the bargee of the Port Jefferson, it is not inherently incredible. Nevertheless, all it proved was that the bargee reported to some unascer-

tained persons, who were still in the office of the Henry Company, that the Sherlie had arrived and been docked. The practice of the company was for an employee, named Gray, to report the arrival of barges to Hemsworth, the "truck despatcher," who would then send out the men who were to "shift" the scows, so that they should be properly placed. When the tug moored the Sherlie astern of the Port Jefferson it was already nearly four thirty, half an hour after the closing hour under the Henry Company's contract with the union. Both Gray and Hemsworth swore that the bargee of the Sherlie had not told them of her arrival. On this testimony we hold that the Shamrock Company failed to carry the burden of proving that the Henry Company had accepted delivery of the Sherlie.

Delivery is a mutual transaction which requires the consent of the person who is to take possession, as well as that of the one who gives it. It is true that tugs often delivered scows to the pier at times other than those for which they had been ordered, and certainly the exact time was not of the essence. Indeed, we need not say that delivery of a barge during working hours in a safe berth was not within the implied consent of the Henry Company, as the business was conducted; perhaps it was part of the understanding that that company would assume responsibility for such barges. This was not such a delivery; not only was it out of hours, but it was to the last degree perilous, as the event proved. If the tug would discharge itself of its duty, it was bound in such circumstances to secure an express acceptance, and there could be no acceptance except by an employee authorized by the Henry Company to accept. The maundering of the Sherlie's bargee was utterly inadequate for the purpose. If a tug master chooses to leave his charge wantonly exposed to destruction, he will not relieve his principal by sending an inarticulate bargee to announce what he has done to whomever he may find about the premises.

Decree reversed; decree to be entered holding primarily liable the Shamrock Company alone; but the charterer secondarily liable.