280 F.2d 308
 TRIBORO SCOW CORPORATION, as owner of THE Scow TRIBORO No. 12, Libellant-Appellee,
v.
M. F. HICKEY CO., Inc., Respondent-Appellant, and
Gallagher Brothers Sand & Gravel Corporation and THE Tug JOHN MURRAY, Respondent-Claimant-Impleaded Appellee.
 No. 353.
 Docket 26155.
 United States Court of Appeals Second Circuit.
 Argued May 10, 1960.
 Decided July 12, 1960.
 
 Vincent A. Catoggio, New York City (Purdy, Lamb & Catoggio, New York City), for libellant-appellee.
 James M. Leonard, New York City (Macklin, Speer, Hanan & McKernan and Gerald J. McKernan), New York City, for respondent-appellant.
 Edward J. Ryan, New York City (Foley & Martin, New York City), for respondent-claimant-impleaded appellee.
 Before CLARK, MOORE and FRIENDLY, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 Libellant, Triboro Scow Corporation (Triboro) brought suit against M. F. Hickey Co. Inc. (Hickey) for damages to Triboro's scow No. 12 alleged to have resulted from Hickey's negligence. Hickey, denying negligence and claiming that the damage was caused by the negligence of Gallagher Brothers Sand and Gravel Corporation (Gallagher) and the tug "John Murray" owned by it, impleaded Gallagher. From an interlocutory decree holding Hickey solely liable for damages to the scow, Hickey appeals.
 
 
 2
 Hickey had ordered a cargo of sand and gravel from Gallagher for delivery at Hickey's plant on or about January 25, 1956. Gallagher to make delivery used the "Triboro No. 12" then under charter to it and caused the scow to be towed by Gallagher's tug, the "John Murray," to Hickey's plant at East Mill Basin, Brooklyn, New York, where tug and tow arrived between 1:00 and 1:30 a. m. on January 25, 1956.
 
 
 3
 Hickey maintained a bulkhead some 250 feet in length on the east side of the Basin, running approximately north and south. The water alongside the bulkhead and outshore therefrom was adequate to provide a safe berth for scows. This fact is not disputed. When the "Triboro No. 12" arrived there were three other scows at the plant, the "Hunts Point" moored alongside the bulkhead (bow facing north), the "McCormack 84" tied outshore against the "Hunts Point" (bow facing south) and the "Amherst" still further out and made fast to the "McCormack 84." The Gallagher tug brought the "Triboro No. 12" in bow facing north. A line attached at the starboard stern corner of the "Triboro No. 12" was then passed to the captain of the "Amherst" who fastened it to the starboard bow corner of the "McCormack 84." The same tug then took the "Amherst" in tow, moved it from its position and placed the "Triboro No. 12" alongside the "McCormack 84" in the position formerly occupied by the "Amherst." At this stage the bow starboard corner of the "McCormack 84" and the starboard stern corner of the "Triboro No. 12" were practically alongside. A line from the starboard bow of the "Triboro No. 12" to the starboard stern of the "McCormack 84" would then have made the "Triboro No. 12" secure to the "McCormack 84" as the "Amherst" had been. However, the captain of the "Triboro No. 12" was unable to get this highly essential line attached. Without being assured that the scow had been made fast and despite the captain's calls to the tug, the Gallagher tug proceeded on its way with the "Amherst" leaving the "Triboro No. 12" with only one line out at the mercy of a substantial wind (estimated at 20 miles per hour) and the current. Attached only at their respective adjacent starboard bow and stern corners, there were no means of keeping the scow alongside the "McCormack 84" and it gradually pivoted in a westerly counter-clockwise direction until its stern was approximately opposite the bow of the "McCormack 84." The "Triboro No. 12" was now heading in a southerly direction with only some 10 feet of its 116-foot length in the berth maintained by Hickey, the balance being over an area of shallow water, underwater piles and a submerged wreck. Shortly thereafter another tug brought in its scow, the "Steers 71," and placed it securely alongside the "McCormack 84" where the "Triboro No. 12" had been and should have been.
 
 
 4
 The captain of the "Triboro No. 12" retired at about 3:00 a. m., apparently satisfied with the scow's position, although he had taken no soundings nor had sought aid from the second tug or from any other source. In the morning, the captain seeing the position of the scow did not advise his employer, the owner, of the situation but proceeded to go ashore and to the city to collect his wages.
 
 
 5
 Thus far Hickey was without knowledge of, and without responsibility for, the scow's position. The scow had been brought in at dead of night in the custody and control of Gallagher and the captain, an employee of Triboro. Its position was attributable solely to them. At or about 7:00 a. m. Hickey for the first time had an opportunity to observe the situation. Some time between 7:00 and 7:30 a. m. the contents of the scow were measured by employees of Gallagher and Hickey. Thereafter a receipt for the cargo was signed by a Hickey employee. Although the paper contains the words "Received from Gallagher Bros. Sand & Gravel Corp." its primary purpose was to record the measurements of the cargo. In heavy letters the word "Measured" is printed, followed by "By Nick * * * Time 7 A.M. N. Y. Jan. 25th 1956." Then under the captions "Depths," "Top Widths" and "Dimensions of Scow" are written various measurements.
 
 
 6
 The trial court placed great significance on this paper. Although the court said that the receipt was "signed at 7:00 a. m. on January 25, 1956," he also found that "Zappoli and Torro completed the measurement of the cargo between 7:00 and 7:30 a. m. after which Zappoli went to the Hickey office where James C. Chambers, Hickey's dispatcher, who was in charge of the yard, signed a receipt for the cargo" and that Hickey had acknowledged receipt "as of 7:00 a. m." The court stressed the facts that (1) the receipt "contained no statement to indicate that the scow was not in a proper place" and (2) if the position of the "Triboro No. 12" were not satisfactory Chambers "would have noted it on the receipt or would have refused to sign it." The assumption, however, that Hickey by acknowledging measurements and receipt of the cargo "as of 7:00 a. m." thereby approved of the position in which Triboro and Gallagher had left the scow is not justified. The proof is clear that Hickey protested to Gallagher and requested remedial action. In addition Hickey endeavored by use of its tractor crane on its dock to move the scow and even tried to call various tugboat operators whose tugs might be in the vicinity. These efforts were unsuccessful. With the falling tide the scow settled on some submerged object, bottom planks were broken, the scow filled with water and capsized.
 
 
 7
 The legal principles applicable are rather well established. Hickey was under a duty to supply a safe berth. Smith v. Burnett, 1899, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756; Waldie v. Steers Sand & Gravel Corp., 2 Cir., 1945, 151 F.2d 129. This duty it fulfilled.
 
 
 8
 Gallagher as owner and operator of the tug had the responsibility of towing the scow to its destination and making sure that it was properly secured. James McWilliams Blue Line, Inc. v. Esso Standard Oil Co., 2 Cir., 1957, 245 F.2d 84; Pittsburgh Consolidated Coal Co. v. Harrison Construction Co. et al., 3 Cir., 1955, 223 F.2d 260. This responsibility was not fulfilled.
 
 
 9
 Triboro's captain could not stand by without taking any action when it became obvious that his scow was far removed from its intended berth. The Castleton, 2 Cir., 1933, 64 F.2d 11; C. F. Harms Co. v. Turner Const. Co., 2 Cir., 1924, 3 F.2d 591.
 
 
 10
 Hickey too was under a duty to exercise reasonable care. Although there is a serious question as to whether there was proper delivery of the scow in its precarious position, this issue need not be determined because the facts show that Hickey took such steps as were reasonable and feasible to try to remedy the situation presented to it by Gallagher and Triboro.
 
 
 11
 Triboro relies on such cases as C. F. Harms Co. v. Erie R. R. Co. et al., 2 Cir., 1948, 167 F.2d 562 and The Everett Fowler, 2 Cir., 1945, 151 F.2d 662, in support of the general proposition that the consignee is under a duty of reasonable care. The abstract principle is, of course, sound but in its application "the degree of care * * * usually must be gathered by reconstructing the relations between the parties in their entirety" (New York Trap Rock Corporation v. Christie Scow Corporation, 2 Cir., 1947, 162 F.2d 624, 627).
 
 
 12
 The one generality which may be safely asserted after examination of many scow cases including The Eastchester, 2 Cir., 1927, 20 F.2d 357, New York Trap Rock Corporation v. Metropolitan No. 4, 2 Cir., 1942, 128 F.2d 831 and F. E. Grauwiller Transp. Co. v. Gallagher Brothers Sand & Gravel Corporation, 2 Cir., 1949, 173 F.2d 708, is that each case depends upon its own facts. The courts have endeavored to answer the question: who really was responsible for the situation which caused the damage? The problem is often difficult to resolve because usually only the borderline cases reach the courts. Here, however, both on the law and the facts liability cannot fairly be imposed on Hickey.
 
 
 13
 Accordingly, the interlocutory decree against M. F. Hickey Co. Inc. is reversed and the dismissal of the impleading petition against Gallagher Brothers Sand & Gravel Corporation affirmed.