GENERAL MOTORS CORPORATION,
Plaintiff,

v.

PENNSYLVANIA RAILROAD COM-
PANY, Defendant and Third-Party
Plaintiff,

v.

LLOYD BRASILEIRO (PATRIMONIO
NACIONAL) et al., Third-Party
Defendants.

GENERAL MOTORS CORPORATION,
Plaintiff,

v.

LLOYD BRASILEIRO (PATRIMONIO
NACIONAL) and John W. McGrath
Corp., Defendants.

Nos. 66 Civ. 4076, 67 Civ. 926.

United States District Court,
S. D. New York.

April 12, 1973.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiff; Vincent J. Ryan, Joseph T. McGowan, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendant Pennsylvania Railroad Co.; Kenneth H. Volk, Guy E. C. Maitland, New York City, of counsel.

Purrington & McConnell, New York City, for defendant and third party plaintiff Lloyd Brasileiro; Frank J. McConnell, Benjamin E. Haller, John Hay McConnell, New York City, of counsel.

McHugh, Heckman, Smith & Leonard, New York City, for defendant John W. McGrath Corp.; Martin J. McHugh, John P. Conroy, New York City, of counsel.

Emile Z. Berman and A. Harold Frost, New York City, for third-party defendant McRoberts Protective Agency Inc.; Morton H. Feder, New York City, of counsel.

GURFEIN, District Judge.

In the small hours of a Saturday morning, March 5, 1966, the lighter 212 was left by a Pennsylvania Railroad ("Penn") tug at the slip on the North side of the pier at 30th Street, Brooklyn. The tug Captain selected the berth, seeing "not a soul" on the pier (TM 140),[1] and moored the scow leaving her unattended. She was laden with eight tractors. General Motors ("GM") had shipped the tractors and forty other items from its Hudson, Ohio plant to New York to be delivered at the order of GM to an ocean carrier for export to Brazil. The lighter was observed by a passing tug as late as 3:30 p. m. on Sunday. At some time before 8 a. m. on

---

1. TM refers to the minutes at the trial.

Monday, March 7, the lighter sank. Three days later she was located about 100 feet from the pier by a diver. Some of the cargo recovered was sold in salvage.

GM sues the rail carrier, Penn, and also Lloyd Brasileiro ("Lloyd"), the steamship line which was the lessee of the pier as well as the connecting carrier; it also sues John W. McGrath Corp. ("McGrath"), the stevedore on the pier.

Penn in turn sues Lloyd, McGrath and McRoberts Protective Agency, Inc. ("McRoberts"), a watchman service. Lloyd sues McGrath; and McGrath sues McRoberts and Lloyd in separate cross-claims. GM claims damages of over $335,000.

The actions were consolidated and a five day trial to the Court without a jury was had on the issue of liability only. The issue of damages was reserved for later disposition.

### HOW AND WHY LIGHTER 212 WAS LEFT AT THE PIER

Penn issued uniform domestic straight bills of lading for the shipments. Upon the arrival of the tractors and parts in New Jersey written orders were given by GM to deliver the shipment to Lloyd at the 30th Street pier, Brooklyn. That pier was leased by Lloyd. McGrath had a contract with Lloyd to render certain services at the pier. The eight tractors and boxes of spare parts were transferred by Penn to its lighter 212 which was then towed by Penn tug from Greenville, New Jersey and moored alongside the Brooklyn pier as described.

The S/S Laide Colombia, owned and operated by Lloyd, was scheduled for departure on March 9. GM and Lloyd had on February 17, 1966 entered into a freight contract for the carriage of six tractors on the S/S Laide Colombia which was extended on February 23, 1969 to cover two more tractors. GM issued written delivery orders to Penn to deliver the tractors on March 1 and 3, 1966. Copies of the delivery orders were sent to Lloyd. The tractors were actually towed to the Lloyd pier on Saturday morning, March 5.

There is no evidence of why the tractors were towed to the pier on Saturday morning. The Captain of the Penn tug was told to do so by his dispatcher who was not called as a witness. No one in the hierarchy of Penn's ocean cargo department has explained the reason for the order. Lloyd did not ask that the tractors be brought to the pier that day. "Permit dates" of March 1 and March 3 had been orally fixed by Penn and Lloyd for the delivery of the tractors to the vessel, which generally meant that they could be delivered at any time thereafter and before the ship sailed.

Since the tractors were large and heavy equipment, (over 45,000 lbs. each) special arrangements had to be made for their loading and stowage. The evidence indicates that, in dealing with that type of cargo, the ship would normally give rather precise instructions on when delivery was to be made to insure coordination for the orderly loading of the vessel according to plan (TM 77).

T. Ruggieri, the Lloyd loading superintendent, testified that he did not expect the tractors to arrive until Lloyd called for them according to the custom with respect to heavy lifts (TM 461). DeSantis, Lloyd's head loading clerk, gave similar testimony: "[W]e try to mesh it in when we have our vessel to coordinate the cargo coming that is heavy and has to go alongside the vessel." (DeSantis, 89).

When the Penn tug Captain, Bryson, left the lighter at the pier he did not deliver his shipping documents to anyone nor did he notify anyone on the pier or Lloyd of the arrival of the cargo. Though Captain Bryson saw "not a soul" on the pier, the lighter was, in fact, soon noticed by Cornelius Williams, the harbormaster at the pier who was employed by McGrath. He saw lighter 212 in her berth between 8 a. m. and 9:40 a. m. when he observed her to be riding normally (Williams, 13, 67). Williams was on the pier that Saturday morning, not in his capacity as harbormaster, but as

part of a gang to "handle lines" for the sailing of S/S Laide Colombia (Williams, 13, 50, 52, 60). His observation of the 212 was casual. He did not know whether its arrival had been notified to anyone (Williams, 43, 60).

There is a general custom in the Port of New York permitting tugs to tie up lighters at steamship piers over the weekend. There was no convincing proof that this custom included heavy lift equipment (*cf.* TM 414–16; 425). It was also established that dock receipts are generally not given by the ocean carrier until it has inspected the merchandise delivered.

It was stipulated by Lloyd and GM that the space booking (Pltf. Ex. 6) was made with the understanding that any cargo delivered to Lloyd was to be carried by Lloyd as a common carrier under Lloyd's standard bill of lading.[2]

## HOW LIGHTER 212 CAME TO SINK

There is practically no solid evidence on why lighter 212 sank. There is a good deal of speculation and some expert testimony on the subject. It is likely that she sank because she had become impinged on some part of the pier during a rising tide which caused her to list to port with a consequent shifting of cargo that ultimately made the manholes on the deck come under water and fill with water. The parties disagree on what made her become impinged on a part of the pier.

She was moored with her portside parallel to the pier, her bow facing the river and her stern facing the shore. She was fastened with two lines. There were no independent fenders.[3] After she sank, the diver determined that she was lying on the river bottom about 100 feet from the pier and that the tractors were near the portside of the lighter and next to the pier.

Penn's expert Sheridan is a marine surveyor. He examined the 212 shortly after the accident and found that there was no structural cause of the sinking (PRR Ex. E); the underwater section of the hull and all six compartments were found to be watertight (TM 271), indicating that enough water to sink her must have come in through the manholes on the deck. He also found that a bitt located about 21 feet from the bow and the forward section of the port guard rail from about 12 feet from the bow aft for 75 feet were missing (TM 299, 649–50, 665; PRR Ex. E).

Sheridan concluded that, in his opinion, the port side of the 212 had become entrapped under some protruding portion of the pier during a rising tide. This in turn caused the tractors to slide over to port, pushing the port side down further and permitting water to enter the manholes. As the hull quickly flooded, the lines to the pier snapped under the great weight and the tractors tumbled over the port side, coming to rest on the bottom next to the pier (TM 276–78).

There was no evidence that there actually was a protrusion from the pier at the time of the accident. Nor did examination after the accident establish the existence of such a condition. Captain Axiotes, a marine surveyor retained by Lloyd after the accident, made an examination of the pier in April 1966. He examined the pier at low tide and found nothing protruding into the slip (TM 391–92). Mr. Rockey, Penn's assistant superintendent for marine operations,

---

2. The bill of lading (Lloyd Ex. AA) provides in part as follows:

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier. * * * "

3. There were rubbing bars on the lighter which Lloyds' expert Wheeler believed would chafe a mooring line (TM 574).

was on the pier shortly after the loss (TM 346, 348). Also F. J. Gerace of Penn and K. P. Felsberg, Jr., representing Penn, were in the company of Captain Axiotes when he examined the pier. None of these was called to testify on whether or not there was a projection from the pier. Sheridan himself did not examine the pier (TM 279, 310). Captain Bryson testified that the lighter was snug against the pier when he made her fast (TM 169–70). The contention that there was such a projection rests on the theoretical reasoning of Sheridan based upon the alleged circumstantial evidence.

Lloyd and McGrath, on the other hand, believe that one of the mooring lines parted because of improper mooring, permitting the lighter, on a rising tide, to swing away from the pier, pivoting on the other line.[4] Since the remaining line was made fast some distance from the corner of the lighter, this would cause its corner to swing under the pier. As the tide rose the corner would rise up against the pier causing the lighter to list and the second line to part. The lighter would then be angled away from the pier and this would account for all but one of the tractors having fallen between the lighter and the pier without damaging the piling.

The proof as to the mooring lines was as follows. Captain Bryson testified that he moored the lighter in the usual way. Although he had difficulty sketching the mooring lines it is clear that they did not extend from the bow corner and the stern corner as Captain Wheeler, Lloyd's expert, testified they should have. It appears that the lines had been made fast to cleats, each located about 15 feet from the bow and stern corners (TM 214, 221).

The average rise and fall of the tide in that vicinity was 5 or 6 feet (TM 152). That weekend the rise and fall of the tides reached extremes of 7 feet above mean low water at 6:30 a. m. on Saturday and at least ¾ of a foot below mean low water at 3 a. m. on Sunday, a difference of 7¾ feet (TM 360–61). Captain Bryson testified that he planned for about a 5 foot drop and hence left about 6 feet of slack which he later at the trial increased to 6½ to 7 feet (TM 152). Captain Bryson conceded that though there was a chock in the center of the stern he did not use it but used the cleats fifteen feet away from the bow and port corners respectively (TM 184).

The Lloyd expert deduces that there was a slack on the bow line (TM 550) projecting over the gunwale which had to be chafed by the pier and that this chafing eventually caused the line to part creating the rest of the scenario. The bow line was not found and testimony regarding what may have been the stern line was equivocal (TM 111–12, 116).

At any rate by Monday morning the 212 had disappeared. At first believed to have been stolen, she was later found by a diver to have sunk next to the pier.

Where the sinking of a ship is shrouded in such mystery the burden of proof may become the key to liability. At any rate the burden of proof must be explored. In this consolidated case, since Penn claims over against Lloyd and McGrath it may be desirable to consider the liability of the latter before we return to the liability of Penn to GM.

### THE LIABILITY OF LLOYD

 ▮ Lloyd did not receive actual notice of the arrival of the cargo.[5] It had

---

4. Lloyd believes it was the stern line that parted (Br. 18). McGrath believes it was the bow line (Br. 14–15).

5. McGahan of GM testified that he told the receiving clerk at Lloyd that the tractors would probably arrive over the weekend (TM 76, 85–86), but McGahan who was not a representative of Penn did not actually know and he could hardly

have been accepted by the receiving clerk as the voice of authority, since delivery arrangements were normally made between the rail carrier which controlled the cargo and the ocean carrier which was to receive it. T. Ruggieri, the loading superintendent for Lloyd, denied receiving any information that the cargo would arrive over the weekend (TM 440–41).

no chance to inspect the cargo before the sinking. It did not sign a dock receipt for the cargo. It did not unload the 212 even partially. It did not tell Captain Bryson at what berth to moor the lighter. It exercised no control over the movement of the tug or lighter. It did not request that the cargo be delivered on Saturday.

GM and Penn seek to impose liability on Lloyd as a connecting carrier or as a wharfinger for hire. GM contends that Lloyd is liable under its ocean bill of lading pursuant to the Carriage of Goods by Sea Act (46 U.S.C. § 1300 et seq.) ("Cogsa") since the goods were "in the custody of the carrier [Lloyd]." On the assumption that the cargo was in the custody of Lloyd it is argued that the burden is on the common carrier to prove that it was free of negligence and that the loss was from an excepted cause. Missouri P. R. Co. v. Elmore & Stahl, 377 U.S. 134, 138, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964). The statute itself provides that in such cases the carrier must assume the burden of proving that the damages sustained by GM were contributed to by "neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier." 46 U.S.C. § 1304(2)(q). If the rule is applicable the burden on Lloyd is heavy.[6]

The preliminary question, however, turns on whether the plaintiff or the third party plaintiff have established by a preponderance of the evidence that there was "delivery" of the cargo to Lloyd and that the cargo was in its "custody." GM maintains that the following facts establish delivery and custody..

1. Lloyd entered into a freight contract with GM to carry its cargo as a common carrier. On February 16, 1966, Trainor, an assistant supervisor of GM, booked six tractors with Lloyd and on February 23 booked the other two tractor shipments (TM 29, 30). Not later than February 22 delivery instructions were given by GM to Penn for delivery to be made on March 1 and 3 (TM 31). These delivery dates were set between Trainor and Dillon of Lloyd. Such dates were generally adhered to but any variation would be the result of coordination between Penn and Lloyd. A document marked "Dock Receipt" was mailed to the receiving clerk at the pier (TM 56). Ruggieri, the loading superintendent employed by Lloyd at the 30th Street pier, testified that he would normally expect the cargo a week before the sailing date (TM 442), though he also testified that in the case of heavy equipment he would call the railroad and tell it when to bring the lighter (TM 469). Placement of lighter 212 and the shipments at the customary and usual place, the Lloyd terminal, is said to be delivery to Lloyd.

2. The arrival of lighter 212 was known to Williams, an employee of McGrath, who as harbormaster was an agent of Lloyd to whom his knowledge must be attributed. Williams' failure to alert anyone to the arrival of the lighter and the alleged failure of a watchman to observe the lighter is the fault of Lloyd.

The first set of facts presumably bases liability on Lloyd's alleged status as a connecting carrier or bailee. The second set of facts presumably seeks to cast Lloyd in liability as a wharfinger. Penn maintains, on its part, that it properly delivered GM's cargo to Lloyd, that it passed the liability for safekeeping to the ocean carrier, and that Lloyd was a bailee and wharfinger which failed to exercise reasonable care.

---

6. While Cogsa by its terms defines the term "carriage of goods" to mean "the period from the time when the goods are loaded on to the time when they are discharged from the ship," 46 U.S.C. § 1301(e), the parties may expand its coverage in the provisions of the ocean bill of lading. Here GM and Lloyd provided: "The provisions stated in said Act (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are *in the custody* of the carrier" (emphasis supplied) (Ex. AA ¶ 1). Such a provision enlarging the scope of Cogsa is specifically permitted by the Act. 46 U.S.C. § 1307.

To support its theory of proper delivery, Penn asserts that the Lloyd personnel were expecting the cargo at some time between March 3, the "permit date" and the scheduled sailing date of S/S Laide Colombia, March 9, and that there was nothing unusual about delivering cargo over the weekend. It concludes that Lloyd was charged with the receipt of the 212 and her cargo. It maintains that delivery by the inland carrier to the ocean carrier in accordance with the legal custom or usage of the Port implies acceptance of the goods by the carrier. It, therefore, makes lack of actual notice irrelevant. Alternatively, it notes that Williams, who saw the 212, took orders from Lloyd and was their agent and that, hence, his knowledge was the knowledge of Lloyd. It argues that by imputing the knowledge of Williams to Lloyd, the latter, as a wharfinger for hire, had a duty to maintain a careful watch over the vessels left at the pier. It argues that Lloyd, as a wharfinger also had the duty to provide a safe berth to invitee vessels, but instead permitted the pier to remain in a hazardous condition.

## DELIVERY

Judge Learned Hand noted that "delivery is a mutual transaction which requires the consent of the person who is to take possession, as well as that of the one who gives it." F. E. Grauwiller Transp. Co. v. Gallagher Bros. S. & G. Corp. [The Sherlie], 173 F.2d 708, 711 (2 Cir. 1949); see American Hoesch, Inc. v. S. S. Aubade, 316 F.Supp. 1193 (D.S.C.1970) (construing Cogsa, 46 U.S. C. § 1303(6)). In the *Grauwiller* case the barge had been left at the pier without notice "out of hours." The Court held that "there could be no acceptance except by an employee authorized by the Henry Company [the wharfinger] to accept." *Id.*

■ To be sure, not every acceptance need be by word of mouth or written agreement. In lieu of such acquiescence, formal or informal, "acceptance" may be the consequence of conduct. That is true as well when the duty of a connecting carrier, as here, is measured under a uniform straight bill of lading.

In Palmer v. Agwilines, 135 F.2d 689 (2 Cir. 1943) the Court of Appeals held that where the barge and its contents had come within the "actual control" of the respondent connecting carrier at its terminal there was delivery. There the bargee upon arrival delivered shipping documents to the receiving clerk at the pier, the employees of the terminal unloaded part of the cargo and themselves shifted the barge. The respondent was held liable for the cargo that remained unloaded on the barge when she sank because the respondent had obtained "possession and control" of the barge and her cargo "after receiving transfer from the libellants of the shipping documents and after commencing to discharge the cargo." 135 F.2d at 690–91.

The same rule applies to a terminal operator sought to be held to a duty of reasonable care because it had received delivery of a scow and cargo. In Roah Hook Brick Co. v. Erie R. Co., 179 F.2d 601 (2 Cir. 1950) it was held that when the scow's barge gave the manifest immediately to a clerk of the terminal operator and there was direction of the scow to a particular berth then there was delivery even though the bill of lading by its terms provided for delivery to the ship. The terminal operator, having taken delivery, was found to have breached its duty of reasonable care in the circumstances of that case.

So too in McAllister Lighterage Line, Inc. v. S/S Steel Age, 306 F.Supp. 19 (S.D.N.Y.1968), the clerk of Isthmian, a common carrier in ocean transportation, actually received the lighter's papers, made the normal entries in the lighterage book, and arrangements were made by Isthmian to shift the lighter to the loading vessel onto which a portion of its cargo was loaded. 306 F.Supp. at 24. Isthmian was held liable for the loss of that part of the cargo that had not yet been removed from the lighter.

■ Although no case has been cited which supports a finding of delivery in circumstances like those at issue GM and

Penn rely on an alleged custom of the Port of New York. As I have noted, it is a common custom in the Port of New York for tug captains to tie up lighters on weekends and leave them unattended. This puts the lighters in the status of invitees. From the point of view of the initial carrier it has thus not trespassed on the pier by mooring its lighter. It is common understanding that it has a right to be there without hindrance. But there is really no proof that the custom goes beyond a general permissiveness and that it goes further to charge the wharfinger or connecting carrier with a duty commensurable with an actual acceptance of delivery. No proof was offered that pier operators concede their liability as a matter of custom when a marine accident intervenes. Nor does proof that there is a custom to do something necessarily make it a rule of law, especially in the absence of mutuality. See Albert v. R. P. Farnsworth & Co., 176 F.2d 198 (5 Cir. 1949). See also Anglo-Saxon Petroleum Co. v. United States, 222 F.2d 75, 77 (2 Cir. 1955).

■ In this case two factors diminish the scope and force of the custom alleged. First, there was no adequate proof that heavy equipment, like these tractors, which often require loading onto the ship directly from the lighter, are embraced within the weekend custom (TM 448–49; 453–54). Second, it is hard to believe that consignees, connecting carriers or wharfingers, would readily acknowledge responsibility for cargo which they had been unable to check and inspect. We deal here with a loss by sinking, but the custom would apply to damaged goods or goods in short count as well. In such case it is hard to believe that a custom which shifted the burden to the terminal operator without more would be accepted with good grace. The operator has nothing to gain and everything to lose from such a custom which

scarcely tends to support a universal acquiescence. I must find that custom does not supply the deficiency in proof of delivery.

If, as I believe, there was no delivery, the sighting of the 212 by Williams would not change the result. Williams had not done anything either to moor the lighter or to direct her to a berth. He was not required to report her presence to his superiors, for he did not know the circumstances under which she came to the pier or whether anyone had already been told she was expected. Since he was not in a chain of command with the responsibility for this lighter he was under no duty to do anything concerning her (Williams, 8–9, 18, 50, 60).[7]

■■ GM and Penn argue, moreover, that since Lloyd was a wharfinger it had the duty to "watch" the invitee lighter and to provide her a safe berth. If her presence was not known to anyone with responsibility the wharfinger could scarcely be under a duty to watch her. The duty of a wharfinger in the Port of New York to use reasonable care Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756, United States Trucking Corp. v. City of New York, 18 F.2d 775 (2 Cir. 1927) is not like the contractual liability of the "fleeter" on southern rivers whose contractual duty it is to check the moorings, have its watchman put lamps aboard, and inspect for safe mooring through the night. See Noonan Construction Co. v. Federal Barge Lines, Inc., 453 F.2d 637 (5 Cir. 1972).

■ While it is true that a legal bailment need not exist to impose upon a person with whom a barge may be left the duty of reasonable care until the owner takes her back, C. F. Harms Co. v. Erie R. Co., 167 F.2d 562 (2 Cir. 1948), the degree of care cannot be generalized. It depends upon the relationship of the parties.

---

7. According to his testimony, Williams' duties, even in regular working hours, were to receive a "lighter list" from the receiving clerk and to get his orders from Ricciardi, the McGrath superintendent, or Ruggieri, the Lloyd man (Williams, 23–24). It was not within the scope of his duties to report the arrival of vessels. See Restatement (Second) of Agency § 275.

There is intimation, indeed, in this Circuit, that the wharfinger, in the exercise of ordinary care, is not required to see whether there is a captain aboard the barge, and that the most that could be required of it in the absence of knowledge of distress would be to render reasonable assistance when requested. See Valentine v. Pennsylvania Railroad Co., 131 F.Supp. 108, 111 (E.D.N.Y.1938), aff'd, 101 F.2d 1011 (2 Cir. 1939). The assumption is that there is no general obligation to "mind" the vessel at the wharf. See Daly v. Reading Company, 220 F.2d 534, 536 (2 Cir. 1955); and see New York Trap Rock Corporation v. Christie Scow Corporation, 162 F.2d 624, 628 (2 Cir. 1947).

If a watch was kept over other lighters, however, a watch should have been kept over the 212 if she was known to be there. But the proof is lacking that the watchmen on that pier did any more than to protect cargo from theft. While obvious situations can be discerned as dangerous even by laymen, as where a line parts, the proof fails to establish that a watchman did observe the 212 while she showed signs of distress and that she was in a condition of danger for a long enough time for an alarm to have been sounded and for her to have been saved.[8] I do not think that there was an affirmative duty to send a watchman out to the stringpiece to "mind" her or that failure to do so properly spells liability.

■■ We turn then to the claim that the berth was foul. While the wharfinger is not an insurer he must use reasonable diligence in providing a safe berth. Smith v. Burnett, *supra;* Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443, 445 (2 Cir. 1943). Since we have found that the lighter was not delivered, she had the status of an invitee, for Lloyd clearly invited scows to tie up at its berths. The lack of "reasonable diligence" to be proved in this case would be the general invitation to vessels to moor, knowing that the berth was foul.

The burden of proving that the berth was foul because of the purported obtrusion from the pier is on the plaintiff and Penn. Smith Scow Corp. v. Consolidated Iron & Metal Co., 275 F.2d 367 (2 Cir. 1960); Bilkay Holding Corp. v. Consolidated Iron & Metal Co., 330 F.Supp. 1313, 1318 (S.D.N.Y.1941). Proof of such a condition might support a finding that the 'lessee of the pier must have known about it. But there must first be proof that the pier was indeed rotten, the hazardous protrusion there, and the berth unsafe. This requires a review of the evidence on the causes of the sinking to determine whether the plaintiff and Penn have proved by a preponderance of the evidence that the lighter sank because of a projection from the pier.

As we have seen, I can make no finding that there was convincing objective evidence that an actual projection from the pier was observed. I am asked to infer, however, from the circumstantial evidence that some projection from the pier, like broken fender pilings, caused the sinking of the lighter. The burden is on GM and Penn to establish this theory by a preponderance of the evidence.

There was no evidence that the particular berth had, before or since, caused a marine accident. Nor was there any evidence that a projection from the pier had suddenly come into existence. It may be asked, therefore, whether the cause of the sinking is more likely to have been the condition of the pier or the manner of mooring the particular lighter.

The proponents rely on the testimony of Captain Bryson that he moored the lighter properly and left her "high and dry" adjacent to the pier. Captain Bry-

---

8. Sheridan, GM's expert, conceded that on his theory of the sinking the time for the sinking "can vary from a portion of an hour to hours. I would hesitate to make a definite time on that" (TM 316). Wheeler thought the sinking could have occurred in eight minutes to an hour (TM 596).

son was not an impressive witness. His recollection of his mooring procedures seemed more general than specific. He relied greatly on his deckhands. He was unable to reconstruct on a simple drawing how the lines were actually rigged that day.

The proponents also point to the fact that when recovered the lighter showed no hull damage to account for the sinking. And I find that she sank because water above the deck filled the manholes on the deck. This was the only firm opinion that Sheridan, Penn's expert, could give for the cause of the sinking.[9] While his theory was that the edge of the barge had to fit in underneath the stringpiece or some projection of the pier at low tide to cause entrapment, he did not examine the face of the pier to see whether there were such projections (TM 277–78). He also acknowledged that for the tractors to have fallen into the water off the port side without impinging on the pier, a line must have broken at some stage to allow the barge to angle away from the pier (TM 313). The proof is not convincing that the lines parted only after the hull flooded, a finding that would be required to support the Sheridan theory. This is, in fact, Penn's theory (Penn Reply Br. at 13).

Although the failure of GM and Penn to establish by a preponderance of the evidence that Lloyd was responsible for a foul berth or lack of reasonable care defeats their claim, the evidence seems heavier, in any event, in favor of the Lloyd-McGrath-McRoberts theory of the cause of the sinking.

I find that lighter 212 was not tied up properly. Captain Bryson conceded that the mooring devices he used were located 12 to 15 feet from the corners of the vessel (TM 208–09). He testified the lines were moored to cleats (TM 214) but he also testified that the eye of each line was placed on a bitt on the barge and the line wrapped around a bollard on the pier bringing the end back to the bitt on the lighter where the eye had been placed (TM 142). The mooring bollards on the pier to which the lines were attached were only 60 feet apart (TM 224; Ex. BA). The lighter was 133 feet long. He conceded on cross-examination that the bow mooring line did not tend forward of the bow (TM 222, 223) but was apparently secured to a bollard which was immediately adjacent to the port bow corner of the lighter.

Captain Wheeler's opinion was that the mooring lines should be led from the extreme corners of the vessel forward of the bow and aft of the stern, in the absence of fender logs, to keep the vessel away from the pier. Thus, sufficient slack would be allowed for tidal changes, with the slack of the line not finding itself between the vessel and the pier. It is possible that the manner of mooring, which allowed the slack to fall between the vessel and pier could have, in five tidal changes from Saturday morning to Monday morning, caused one or the other of the lines to chafe to the point of parting. The swing of the vessel would then tend to make the corner hang up under the pier where the position of the mooring line, which was a distance from the corner of the vessel, would act as a fulcrum impinging the corner. The swing out of the vessel at its free corner would on the change in tide cause her to list.

The theory seems the most reasonable in the circumstances [10] but my actual

---

9. "I could conclude that there was no definite indications [sic] as to the cause of sinking, except that there was no large means entry of water into the hull, except by means of the manhole." (TM 264–65)

10. There is some difficulty with Wheeler's theory as well, for he believed that the cargo would have slid to the "aft port corner" (TM 554, 565, 578), apparently on the assumption that the bow line had snapped, while the proof indicates that it was the rail from midships to the forward part of the lighter that actually went (TM 580–85, 649–50). If it was the stern line that snapped, the cargo would likely have shifted to the fore port corner, in keeping with the apparent tearing of the forward part of the rail.

decision is that the plaintiff and third party defendant have not sustained their burden of proof that the berth was foul.

## THE LIABILITY OF PENN

 Penn contends that it is not liable to GM except for negligence and that such negligence has not been proved. Penn's contention cannot be supported.

The tractors were delivered by GM to Penn as a common carrier by rail pursuant to a uniform straight bill of lading. That bill of lading contained the following relevant provision (Ex. 4): "Sec. 1(a). The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided." The exceptions in Section 1(b) are for "act of God, the public enemy, the authority of law, or the act or default of the shipper or owner, or for natural shrinkage." None of these exceptions is applicable and, on the face of it, the carrier is liable as at common law.

The uniform bill of lading is based on the Carmack Amendment, 49 U.S.C. § 20(11)[11] which "codifies the common-law rule making a carrier liable, without proof of negligence, for all damage to the goods transported by it, unless it affirmatively shows that the damage was occasioned by the shipper, acts of God, the public enemy, public authority, or the inherent vice or nature of the commodity." Secretary of Agriculture v. United States, 350 U.S. 162, 165, n. 9, 76 S.Ct. 244, 247, 100 L.Ed. 173 (1956).

At common law "the burden of proof is on the carrier to show *both* that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." Missouri P. R. Co. v. Elmore & Stahl, *supra*, (emphasis supplied).

Without an excepted cause, freedom from negligence alone is not enough to exonerate the carrier. Nor is the liability of the railroad affected in this case by any provision for "water carriage" because the bill of lading specifically provides (Sec. 9(f)): "The term 'water carriage' in this section shall not be construed as including lighterage in or across rivers . . . when performed by or on behalf of rail carriers." And since delivery to the connecting ocean carrier was not effected, the provisions of Cogsa (46 U.S.C. § 1300 et seq.) would not apply, in any event.[12]

The only pause in this simple chain of reasoning is supplied by the terms of Section 4(f) which provides: *"Property destined to* or taken from *a* station, *wharf* or landing *at which there is no regularly appointed freight agent shall be entirely at risk of owner after unloaded from* cars or *vessels* or until loaded into cars or vessels, *and, except in case of carrier's negligence, when* received from or *delivered to such stations, wharves,* or landings *shall be at owner's risk* until the cars are attached to and after they are detached from locomotive or train or *until loaded into* and after unloaded from *vessels."* [13]

This subsection was construed by Judge Learned Hand in Charles J. Webb & Sons, Inc. v. Central R. Co. of New Jersey, 36 F.2d 702, 704 (2 Cir. 1929), as follows: "It might, indeed, be argued that goods not 'entirely' at the owner's risk might still be not 'entirely' at the carrier's; that is, he might be liable only for negligence. However, the second part of the clause in its present form answers any such contention, since it contrasts the carrier's liability for negligence before loading with another thereafter. That other can be nothing but his liability at commonlaw, as pro-

---

11. "Any common carrier . . . receiving property for [interstate] transportation, . . . shall issue . . . [a] bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it."

12. See for a similar doctrine of liability of a cargo ship Commercial Molasses Corp. v. N. Y. Barge Corp., 314 U.S. 104, 109, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

13. The words deemed applicable to the present case have been italicized.

vided in section 1(a)." The language of Section 4(f) of the uniform bill of lading does not exempt the carrier by rail from liability, even in the absence of negligence, before it unloads its cargo at a wharf where, as here, it has no regularly appointed agent.

Penn is held liable to GM for the damage resulting from the loss of the tractors.

The other defendants are not liable.

An interlocutory judgment will be entered by the Clerk.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).